**William SMITH, Petitioner–Appellant,**

v.

**SECRETARY OF NEW MEXICO DEPARTMENT OF CORRECTIONS; Derald Kerby, Warden, Central New Mexico Correctional Facility, Respondents–Appellees.**

No. 93–2218.

United States Court of Appeals, Tenth Circuit.

March 7, 1995.

Stephen P. McCue, Federal Public Defender, Albuquerque, NM, for petitioner-appellant.

Margaret McLean (Tom Udall, Atty. Gen., with her on the brief), Asst. Atty. Gen., Santa Fe, NM, for respondents-appellees.

Before BRORBY, LOGAN and EBEL, Circuit Judges.

BRORBY, Circuit Judge.

Petitioner-appellant William J. Smith appeals the district court's order denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Mr. Smith's primary basis for requesting relief from his two 1978 first degree murder convictions in New Mexico state court, and his corresponding consecutive life sentences, is the prosecution improperly withheld material exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. Our jurisdiction [1] arises under 28 U.S.C. § 1291.

---

1. Although the district court's order denying Mr. Smith's petition for a writ of habeas corpus is a "final judgment" for purposes of 28 U.S.C. § 1291, the district court denied his request for a certificate of probable cause to appeal. *See* 28 U.S.C. § 2253. As we discuss below, the requirement that a habeas petitioner obtain a certificate of probable cause to appeal is a prerequisite to appellate jurisdiction; thus, the district court's refusal to grant a certificate of probable cause to appeal would limit our jurisdiction. Nonetheless, for reasons discussed in the body of this opinion, we conclude Mr. Smith has shown probable cause to appeal such that we will grant his request for a certificate of probable cause. *See id.* Accordingly, we have jurisdiction to consider this appeal.

## I. BACKGROUND

### A. *Preliminary Facts*[2]

■ During the afternoon of Friday, August 12, 1977, rancher Wayne Wallace found the bodies of two young women in one of his corrals in rural Torrance County, New Mexico, near the small town of Mountainair. One of the bodies, later identified as that of Leslie McDonnell, was clothed in a yellow Budweiser T-shirt, jeans and no shoes. The other body, later identified as Cari Talton, a.k.a. Cari Newell,[3] was found naked. A pair of jeans, a green T-shirt with the word "Okies" on it, and a pair of tan boots and socks were found next to Ms. Talton's body; however, no underwear could be located.

Autopsies were performed the next day by Dr. J. Gauthier of the State Medical Examiner's Office. His examination of the partially decomposed bodies revealed Ms. McDonnell had been shot in the head by what could have been a shotgun, and Ms. Talton had been shot in the head and in the right side of her pelvis.[4] Based on his finding of shotgun pellets and wadding in the vicinity of both of Ms. Talton's wounds, Dr. Gauthier concluded

she had been shot with a shotgun, although he could not determine whether the same shotgun inflicted both of her wounds. Nelson Welch, an expert for the prosecution, testified[5] although Ms. Talton had in fact been shot by a 12–gauge shotgun, he could not determine whether State's Exhibit 44, a 12–gauge shotgun belonging to Mr. Smith, was the gun actually used to shoot her. David Ramirez, a criminalistics expert, testified there were no workable prints on Exhibit 44, nor was there any indication the weapon had recently been cleaned. Dr. Gauthier was unable to determine the precise time of death due to the decomposition of the bodies. He did indicate, however, that the degree of decomposition of the bodies was consistent with the women having been dead for two to three days.[6]

Because the women's bodies were found within the geographical limits of Torrance County, the initial investigation was undertaken by the Torrance County Sheriff's Department and the New Mexico State Police. When it was subsequently learned the women were from Albuquerque, in Bernalillo

---

2. As is often the situation in many habeas corpus appeals, the sheer volume of the record, coupled with the factual complexity of the case and its age, makes our efforts to reconstruct what took place many years ago all the more difficult. The subsequent recitation of the background of this case should thus be understood in this light.

Pursuant to 28 U.S.C. § 2254(d), federal habeas courts must afford a presumption of correctness to a state court's findings of "basic, primary, or historical facts and the inferences that can properly be drawn regarding them." *Case v. Mondragon*, 887 F.2d 1388, 1393 (10th Cir.1989) (citing, *inter alia, Marshall v. Lonberger*, 459 U.S. 422, 431–32, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983)), *cert. denied*. 494 U.S. 1035, 110 S.Ct. 1490, 108 L.Ed.2d 626 (1990); *see also Brecheen v. Reynolds*, 41 F.3d 1343, 1348 n. 1 (10th Cir. 1994). "Thus, [factual findings] must be determined, in the first instance, by state courts and deferred to, in the absence of 'convincing evidence' to the contrary, by the federal courts." *Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam). As long as there is at least "fair support" in the record, a state court's findings of fact may not be disturbed by federal courts on habeas review. *See Marshall*, 459 U.S. at 432, 103 S.Ct. at 849–50; *see also Sumner v. Mata*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (presumption of correctness requires a "high measure of deference" by federal habeas courts).

3. Cari Talton often used the last name of her boyfriend or common law husband "Randy" Newell. Quotation marks are placed around the name "Randy" because, as we discuss later, "Randy" Newell was actually Samuel Newell. In fact, there was a real Randy Newell, who was Samuel's brother. Samuel Newell allegedly used his brother's name because he wanted to conceal his true identity. This issue is discussed in greater detail in the body of this opinion.

4. With respect to the pelvic gunshot wound on Ms. Talton's body, Dr. Gauthier characterized it as a contact shotgun wound near the groin area. He further observed that the wound was inflicted directly over a professional tattoo. He also indicated his belief that because of the unusual location of the wound, whoever inflicted it did so intentionally.

5. All references to the "testimony" of individuals are to their testimony at the second trial in this case unless otherwise indicated. Mr. Smith's first trial ended in a mistrial.

6. Entomologist Clifford Crawford testified that a maggot collected from Ms. McDonnell's body was at a stage of development consistent with having hatched approximately two and a half or three to eight days earlier.

County, the Albuquerque Police Department also became involved. Prior to the time when the decision was made to prosecute these cases in Bernalillo County, the cross-jurisdictional nature of these cases resulted in two different investigative tracks. The Bernalillo County investigation focused on Mr. Smith and some of his friends, while the Torrance County investigation targeted "Randy" Newell.

### B. The Results of the Bernalillo County Investigation

Robert Hume had been living with Ms. McDonnell for about a year and a half at the time of her disappearance. He told authorities he first met Ms. Talton on Monday, August 8, 1977, when she and Ms. McDonnell arrived at the home of Mr. Hume and Ms. McDonnell. Mr. Hume indicated the two women stayed for an hour or so before they left to go out drinking and looking for drugs. The women went to a party that night at the home of one of Mr. Smith's friends, Rick Emmons. Ms. Talton, who was living with her common law husband "Randy" Newell, met Mr. Smith at the party and they had sexual intercourse numerous times that evening. At the same party, Ms. McDonnell met Billy Grubbs, Mr. Smith's roommate, and she ended up spending the night with him at Messrs. Smith and Grubbs' house. The next time Mr. Hume saw Ms. McDonnell was at 5:30 a.m. on Tuesday morning, when she returned home. Mr. Hume stated when Ms. McDonnell came home, she was crying and she asked him to hold her because she had used too much cannabinol, the active ingredient in marijuana, that night.

When Mr. Smith awoke on Tuesday morning, August 9, he discovered a gram of cannabinol, which was worth about $100, was missing from his stash of drugs. He testified he assumed Ms. Talton had taken it. At around 10:00 a.m., he drove his van to the residence of two of his friends, Harvey Bylsma and Ginger Donham. Mr. Smith wanted Mr. Bylsma's help in retrieving his pickup, which had been impounded. Mr. Smith also

realized Mr. Bylsma's neighbor had a phone, and Mr. Smith had Mr. Bylsma call Mr. Smith's boss to let him know he would not be coming into work that day. Approximately half an hour later, Mr. Smith, along with Mr. Bylsma, Ms. Donham and her daughter April, left Ms. Donham's house and went to Ms. McDonnell and Mr. Hume's house to inquire about the missing cannabinol. Mr. Smith wanted Ms. McDonnell's assistance in finding out where Ms. Talton lived.

Both Mr. Hume and Mr. Smith testified Mr. Smith arrived at Mr. Hume's house around 10:30 a.m., accompanied by three other people. At that time, Mr. Smith told Ms. McDonnell either she or her girlfriend (i.e., Ms. Talton) "ripped off" his drugs the night before. He stated he wanted Ms. McDonnell to take him over to Ms. Talton's house so he could talk to her because he did not think she, Ms. McDonnell, had taken the drugs. Ms. McDonnell agreed and voluntarily left her house with Mr. Smith and his companions.

When they arrived at Ms. Talton's house, she was on the couch, and she told them to come inside. Mr. Smith went in and spoke with Ms. Talton for a few minutes about the missing cannabinol while the others waited outside. Ms. Talton told Mr. Smith he had probably lost or misplaced the cannabinol at his house, and she suggested they go back to his house to look for it. Mr. Smith agreed, and they all went back to his house to look for the drugs. Ms. Donham's testimony confirmed this sequence of events.

While Mr. Smith was looking in his kitchen for the missing drugs, Ms. Talton came in with a bag containing about half a gram of cannabinol, proclaiming to have found the missing drugs. Mr. Smith, however, did not believe her and he accused her of having had the drugs all along. When he asked her where the other half a gram was, Ms. McDonnell stepped in and agreed to reimburse Mr. Smith for the missing half gram of cannabinol, which was worth approximately $50. Mr. Smith then took the remaining half gram and put it with the rest of his stash.[7]

---

7. Mr. Hume made a statement to the police that "he heard the girl or girls advise that they would pay back Bylsma, Grubbs, and Smith 'by Friday' (12 August)" for the missing half gram of cannabinol. Although Mr. Hume did not testify to this

Ms. Donham testified they all got back in Mr. Smith's van at around 11:30 that morning, which was the last time she saw Ms. Talton and Ms. McDonnell with Mr. Smith. Mr. Smith then dropped Ms. Donham off at her home.[8] Half an hour later, Messrs. Smith and Bylsma showed up at Ms. Donham's house for lunch, where they stayed until around 2:00 in the afternoon, at which time Mr. Smith, Ms. Donham, Mr. Bylsma, and April went to Kenneth LaDue's house. Mr. LaDue had sold Mr. Smith a 1950 purple Ford pickup truck, which had been impounded; however, the paperwork had never been transfered properly to Mr. Smith's name. Thus, before he could get his truck from Broadway Towing, where it was impounded, he needed to see Mr. LaDue.

Ms. Donham testified she spent the rest of Tuesday with Mr. Smith. Several other witnesses provided a detailed account of Mr. Smith's whereabouts on Tuesday, the day the prosecution claimed the murders were committed. From 2:30 until around 5:00 p.m., these witnesses stated Mr. Smith was either with Mr. LaDue or he was at Broadway Towing, trying to get his truck out of the impoundment lot. Finally, Ms. Donham testified Mr. Smith stayed at her house [9] for the remainder of the work week. She testified in some detail about what occurred on those days, and she indicated she never heard Mr. Smith leave the house during the night as she was a light sleeper and would have heard him moving around. Mr. Smith's employer Bill Gourly also provided Mr. Smith an alibi for the rest of the week as he testified Mr. Smith was at work during those days.

Randy Appert and his roommate Ralph Strom testified that around this time, Mr. Smith had come to consider their apartment as his own and he had his own key. Mr. Appert testified Mr. Smith came by the house on Saturday, August 13, and asked him if he could leave his gun at their house. Mr. Appert told him he did not know. Apparently, Mr. Smith left the gun there anyway because Mr. Appert testified the next time he saw the gun was when the police removed it from a closet in their house pursuant to a search warrant. Mr. Strom testified he did not know Mr. Smith had left the gun at their apartment either.

Nikki Thompson testified she was at the home of Messrs. Strom and Appert that Saturday morning when Mr. Smith showed up with a gun, similar in size to Exhibit 44, Mr. Smith's shotgun, in his hands in plain view. She further testified on direct examination she overheard a conversation between Messrs. Strom and Smith. She testified she heard Mr. Smith say something like "he had been burned and the people had been punished," although she denied ever hearing Mr. Smith say he had recently used the gun. During an evidentiary hearing several years later, however, Ms. Thompson, then using her marital surname of Peters, admitted she had perjured herself. While she had heard Mr. Smith tell Mr. Strom he had been "burned," she admitted she never heard Mr. Smith say anything about having to punish, or having actually punished, anyone. She said she lied because she had been coerced to do so by Dana Smith, a good friend of Ms. McDonnell. Ms. Smith testified at trial that Ms. Thompson told her Mr. Smith said he had to punish two girls.

Mr. Strom testified that later on that Saturday, he went with Mr. Smith to buy some parts for Mr. Smith's truck, but they ran out of gas. The two men decided to go to a bar, at which time Mr. Strom recalled Mr. Smith mentioning someone, without using names, had "ripped off" some of his cannabinol.

fact at trial, this statement was admitted during Mr. Smith's post-trial evidentiary hearing.

8. Mr. Smith's van, which the prosecution alleges was used by him in the commission of the crimes for which he was later charged, was searched by a Detective Lewis. Detective Lewis testified he found no blood, mud, dirt, or other evidence tending to show the van was somehow linked to these crimes, nor was there any evidence that the van had recently been cleaned. He did, however, find a cigarette case that Mr. Newell testified belonged to Cari Talton. The cigarette case, however, proves only that Ms. Talton was in the van, a fact not disputed by the defense.

9. The fact that Mr. Smith was staying somewhere other than his own home was not that unusual. Due to problems with their landlord, Messrs. Smith and Grubbs had been planning to move out of their house anyway.

"Randy" Newell was called as a witness for the prosecution. He testified he had been living with Ms. Talton as common law husband and wife at the time of her disappearance, and the last time he saw her was late in the afternoon on Monday, August 8. Although she was not home when he left for work the next morning, he could tell she had been home at some point that morning because when he came home for lunch, he noticed the clothes she had been wearing the night before were either on the floor or the bed.

Mr. Newell testified on direct examination about his relationship with Ms. Talton. He initially stated they got along "pretty good"; on cross-examination, however, he admitted she had not come home at night on at least two occasions, including Monday, August 8, and that this bothered him and made him unhappy. He also conceded they used to have "little arguments," and that one such argument resulted in Ms. Talton stabbing him with a knife. Mr. Newell also admitted both he and Ms. Talton were recovering heroin addicts and they would get up in the morning and go to a drug addiction program where they would receive oral methadone doses. Dr. Castillo, the clinical director of the program, testified Ms. Talton received her last dose of methadone sometime between 6:00 and 10:00 a.m. on Tuesday, August 9, 1977.

Determining the day and time of death was an important issue that received a significant amount of attention at trial. "Randy" Newell's testimony was central to the prosecution's case because he supported their theory that Mr. Smith killed the women on Tuesday.[10] The prosecution attempted to bolster the inference it wanted the jury to draw from Mr. Newell's testimony—that the women were killed on Tuesday—through the testimony of several other witnesses, including the aforementioned Clifford Crawford and Dr. Gauthier. Lois Chapman, Ms. McDonnell's grandmother, testified she and

Ms. McDonnell's mother, Lois Strader, planned to meet Ms. McDonnell for lunch on Tuesday, August 9. Ms. Chapman further testified she spoke with Ms. McDonnell on Monday to finalize the arrangements, but she never showed up on Tuesday. When Ms. Chapman called her granddaughter at work, she was told she was not there. Ms. Chapman never heard from her granddaughter again. She claimed she and Ms. Strader looked for Ms. McDonnell for the rest of the week, but they, nor anyone else, had seen her.

The defense introduced its own evidence on the question as to the time of death in an attempt to discredit the prosecution's theory that the women were killed on Tuesday. Wayne Wallace, the rancher who found the bodies in his corral on Friday, August 12, testified he used to go to his corrals every other day. He stated when he had been out to this corral on Wednesday, August 10, he did not notice anything unusual. In addition, when he described how he found the women's bodies on Friday, he stated one of the bodies was clothed in a yellow T-shirt which stuck out "like a neon light." From this, Mr. Wallace deduced the bodies were not there on Wednesday because if they had been, he would have seen them.

Ruth Shockey testified she rented Ms. Talton and Mr. Newell a duplex apartment located in the back of her yard in July of 1977. Ms. Shockey's house had a window in the bedroom enabling her to see into the yard. After she was unsuccessful in several attempts to collect the rent from Ms. Talton and Mr. Newell, she initiated legal proceedings to have them evicted. The eviction papers were posted on the door to the apartment on Monday, August 8. Ms. Shockey testified that between 3:00 and 4:00 p.m. the next day, she saw Ms. Talton and another blonde woman,[11] through her bedroom window, going into the apartment while they were crouched down. Ms. Shockey thought

10. As the discussion above indicates, the testimony of Mr. Gourly, who was Mr. Smith's employer, and Ms. Donham, provided Mr. Smith with a relatively strong alibi for the remainder of the week. Thus, proof that the women were killed on Tuesday, presumably in the afternoon, was important because it was arguably the only day

when Mr. Smith had the opportunity to kill the women.

11. It is undisputed Ms. McDonnell had blonde hair.

they were crouching down to hide from her. She then testified she never saw Ms. Talton again after that day. Moreover, although Mr. Newell testified he spoke to Ms. Shockey on Tuesday, Wednesday, Thursday, and Friday of that week to ask her if she had seen Ms. Talton, Ms. Shockey denied ever speaking to Mr. Newell until Friday, when Mr. Newell told her he had not seen Ms. Talton in four days and that he did not really care.

The defense also introduced the testimony of Walter Spruill, a retired member of the Navy. Spruill testified that sometime in early August of 1977, he and his mother were driving to the nearby town of Moriarty when they saw a young, blonde-haired woman walking on the side of the highway. His mother, a retired teacher, thought the woman may have been one of her former students. Mr. Spruill turned the car around and picked the woman up. He described her as blonde and rather thin. She rode in the car for twenty or so minutes until they dropped her off. Mr. Spruill then testified he saw this same woman on a Wednesday, about four to six days later, at the "Travelburger" drive-in. He specifically recognized her as the woman to whom he had given a ride a few days earlier. In court, he identified this woman as Ms. Talton from her picture. He also remembered the woman at the restaurant was wearing a bluish colored T-shirt with the word "Okies" on it and that she was with a heavier woman in a Budweiser T-shirt. He testified he saw the women for five to eight minutes, and he recalled giving them three cents when they were short of money for their food. He also testified he gave the thinner woman a book of matches after she had asked him for a match, and that he saw the women get into a grey two-door Pontiac automobile.

Finally, the defense called Alton Green, the owner of the "Travelburger" restaurant. His testimony essentially corroborated Mr. Spruill's testimony of what had transpired at the restaurant that Wednesday, which was August 10. He specifically remembered the two women because they, along with Mr. Spruill, were the only customers in the restaurant at that time. He also recalled both women were wearing T-shirts and Levi jeans.

### C. The Results of the Torrance County Investigation

While the aforementioned evidence and testimony constituted the essence of the prosecution's case against Mr. Smith, he was not, at least at the outset, the only suspect being investigated in regard to these murders. Torrance County's law enforcement officials who were investigating this case had reason to, and did in fact, suspect "Randy" Newell may have been the perpetrator of these killings.[12]

On August 18, 1977, at around 2:35 p.m., "Randy" Newell was driving his automobile near the scene where the bodies had been found when he collided with a semi tractor trailer. New Mexico Police Officer Donald Morrison was dispatched to the scene of the accident. Officer Morrison memorialized the following sequence of events in his report of August 19. Officer Morrison first asked Mr. Newell if he was injured, and Mr. Newell responded he was not. Officer Morrison then arrested Mr. Newell for driving while intoxicated, careless driving, and driving without a license. When Officer Morrison told Mr. Newell he was going to perform "a standard routine inventory" search of his car, however, Mr. Newell complained of various injuries and asked to be taken to a hospital. Officer Morrison further stated Mr. Newell asked either to be allowed to drive his car to the hospital or to have his car towed to the hospital. The first request was denied because the vehicle was not drivable due to extensive damage from the accident. His car remained at the scene so Officer Morrison could inventory its contents. Mr. Newell was then taken by ambulance to a hospital in Albuquerque.

During the inventory search of Mr. Newell's automobile, Officer Morrison found a

---

12. The federal magistrate judge who issued a report and recommendation in May of 1993 on Mr. Smith's federal petition stated he had reviewed all the state court evidence in this case; in his own words, "Randy" Newell was not just a suspect, he "was the focus of the Torrence [sic] County investigation."

white plastic bag on the rear passenger's side floorboard. His report stated: "[u]pon opening the white plastic bag, I found women's clothes that were damp and which smelled of mildew and had, what appeared to me, to have blood and hair on them. They were women's pants, blouses and panties." Officer Morrison found another plastic bag containing men's clothes with stains he characterized as "possibly blood." His report also disclosed Mr. Newell had been stopped in this same area four days earlier, on Sunday, August 14, for reasons not disclosed in the record. At that time, the vehicle was searched by Officer Mark Kennedy pursuant to Newell's written consent. When Officer Kennedy requested permission to search the trunk, Mr. Newell informed him he did not have a key to the trunk.

Officer Morrison immediately advised Captain Frank Lucero, Sergeant Robert Gonzales, and Officer Mark Kennedy, members of the New Mexico State Police, of the existence of the clothes. Captain Lucero then told Officer Morrison to "relay these [items] to the Crime Laboratory next date, 08–19–77, to be compared with the evidence found at the scene of the homicide." Officer Morrison's report further indicated assistant district attorney Neil Mertz, the Albuquerque prosecutor assigned to handle the grand jury phase of the Talton–McDonnell homicides:

> was notified of the[se] findings and stated Mr. Newell had been a suspect due to him being involved in a fight with his wife, victim Carrie Newell, on a previous occasion. . . . Further, because Mr. Newell was found within the general vicinity where the two homicide victims, McDonnell and Newell, were found, he was considered a suspect.

Officer Morrison's report thus clearly stated "Randy" Newell was in fact a suspect in the Talton–McDonnell double homicide.[13] The report also contained a motive for "Randy"

Newell to have murdered Ms. Talton,[14] namely, jealousy.

Later that same day, Officer Morrison prepared an affidavit in support of a search warrant for Mr. Newell's car. In the affidavit, he describes what he found during his inventory search of the car. He further stated he learned, from other officers, that Mr. Newell had previously been stabbed by Ms. Talton, a fact that "suppl[ied] [Newell] with a . . . motive for killing Carrie Newell." He further stated his belief that having found the clothes with possible traces of blood "makes it likely that these items are connected with the homicides and that other similar items and weapons may be found elsewhere in . . . the car Newell was driving." The subsequent search of the vehicle revealed no further evidence.

In accordance with Captain Lucero's directive, Officer Morrison then took the clothes recovered from Newell's car to Wayne Ferguson of the New Mexico State Police Crime Laboratory on August 19, 1977, for testing. Although Officer Ferguson tested a number of items recovered from the vehicle, he did not, for some unknown reason, test the women's clothing found in the white plastic bag. The men's clothing was tested, and it tested negative for blood; however, Ferguson admitted these tests might be inaccurate because the clothing had been stored in moist conditions contributing to the growth of mildew.

On October 3, 1977, Officer Ferguson turned over the untested items, including the women's clothing, to Officer Larry Michaelscheck of the Albuquerque Police Department, who in turn gave the items to Detective Laycock of the Albuquerque Police Department Criminalistics Laboratory. Detective Laycock, however, did not perform any tests on the women's clothes because he was instructed not to by a supervisor, Lieutenant

---

13. Under the section in the police report describing the nature of the incident, Officer Morrison wrote: "TRAFFIC ACCIDENT WITH POSSIBLE HOMICIDE EVIDENCE FOUND TO CASE # 77–1408, VICTIMS CARRIE NEWELL AND LESLIE MC DONNELL." In another section entitled "VEHICLE STATUS," he noted: "POSSIBLE SUSPECT."

14. The record does not disclose whether Mr. Newell had a specific motive for killing Ms. McDonnell. But this absence of a motive is equally applicable with respect to the prosecution's case against Mr. Smith since no motive for him to have killed Ms. McDonnell was ever advanced.

Hubeny, for reasons again not apparent from the record. By the time of the evidentiary hearing in this case in 1983, this evidence had been destroyed, and thus, it was never tested to determine if it could somehow be linked to the Talton–McDonnell homicides.

At around the same time Officer Morrison arrested "Randy" Newell and found the clothing in his car, Sergeant Gonzales of the New Mexico State Police prepared a "Supplemental Report" regarding his investigation into the Talton–McDonnell homicides. His report, dated August 16, 1977, indicated he had contacted someone in the Albuquerque Police Department who told him "a Mrs. Pitchford had contacted him with some information regarding Kari Newell." Sergeant Gonzales' report indicates he then contacted Mrs. Pitchford himself and she told him, *inter alia*, that "Randall Newell was also known as Samuel J. Newell."

### D. *The Indictment*

Although there was arguably some evidence tending to show "Randy" Newell may have been involved in the Talton–McDonnell homicides, there was also evidence tending to show Mr. Smith may have been involved. The prosecution exercised its prosecutorial discretion and elected to seek an indictment from the grand jury in Bernalillo County, New Mexico, against Mr. Smith.

On August 19, 1977, the grand jury returned an eight-count indictment charging William J. Smith with two counts of kidnapping and two counts of first degree murder for the deaths of Cari Talton and Leslie McDonnell. The remaining counts of the indictment charged Mr. Grubbs with two counts of being an accessory to kidnapping and two counts of being an accessory to first degree murder. Mr. Bylsma and Ms. Donham were also indicted for the murder of Ms. Talton and Ms. McDonnell. Prior to trial, the prosecution entered a *nolle prosequi* with respect to the charges against Mr. Grubbs due to insufficient evidence. Thereafter, the charges against Ms. Donham were also dismissed, although it is unclear whether the

prosecution entered a *nolle prosequi* as to her or whether the court dismissed the indictment against her. In any event, she was not required to stand trial, and the case proceeded against only Mr. Smith and Mr. Bylsma.

### E. *Trial Proceedings*

After assistant district attorney Mertz handled the grand jury phase of the case, it was assigned to Peter McDevitt for purposes of trial. Mr. McDevitt later recused himself because he knew some of the parties involved in the case, and it was reassigned to assistant district attorney Roy Anuskewicz, Jr., who was assisted by Virginia Ferrara.

The prosecution's theory was Mr. Smith killed Ms. Talton and Ms. McDonnell on Tuesday, August 9, out of revenge for Ms. Talton having stolen some of Mr. Smith's cannabinol.[15] The motive for Ms. McDonnell's killing is more troubling, especially in light of the Mr. Smith's own testimony that he did not believe she had taken the drugs. This statement, coupled with Ms. McDonnell's agreement to reimburse Mr. Smith for the missing half gram, raises a question over the motive for Ms. McDonnell's killing. The prosecution's theory may simply have been that Ms. McDonnell was in the van with Mr. Smith and Ms. Talton when Mr. Smith killed Ms. Talton, and that Mr. Smith had to kill Ms. McDonnell because she witnessed Ms. Talton's killing and she could have identified Mr. Smith as the perpetrator.

Timing was central to the prosecution's case. As previously indicated, it was essential for the prosecution to establish the women were killed on Tuesday, August 9, an important fact that did not escape the attention of the prosecution. In her opening statement, Ms. Ferrara asked the jury "to pay special attention" to the evidence regarding the day and time of death, evidence she called "very important." As a practical matter, the prosecution had to establish Tuesday as the day the women were killed in order to convict Mr. Smith because the testimony of

---

**15.** Although it was never firmly established that Ms. Talton had in fact stolen Mr. Smith's cannabinol, the record is clear Mr. Smith *thought* Ms. Talton had stolen it, thereby supplying him with a motive for the killing.

Ms. Donham, coupled with the testimony of Mr. Smith's employer Bill Gourly, gave Mr. Smith a relatively strong alibi defense by accounting for Mr. Smith's whereabouts for the rest of the second week of August 1977. Thus, the prosecution had to prove the women were killed on Tuesday in order to show Mr. Smith had the opportunity to commit these crimes.

Mr. Smith was initially represented by Anthony Lucero Jr., and one week prior to trial, the court ordered Mr. Lucero to obtain additional counsel to assist him at trial because he had been indicted in federal court. Mr. Lucero retained the services of Warren Harris. On August 22, 1977, prior to the trial in this case, Mr. Lucero filed a motion for discovery pursuant to the New Mexico Rules of Criminal Procedure. The motion sought, *inter alia*, "[p]olice reports of whatever kind or nature, whether initial or supplemental, relating to investigation or inquiring into circumstances surrounding these criminal complaints." Eight days later, the trial court signed an order stating:

> That the Defendant, WILLIAM SMITH, should be, [and is] hereby ordered to be given Discovery, pursuant to Rule 27 of the Rules of Criminal Procedure, by the District Attorney's office, for the Second Judicial District, [who] shall disclose all police reports, records, papers, documents, photographs, or other tangible objects or copies thereof, including scientific experiments made in connection with this case, immediately, and shall continue to provide the copies to the defense counsel during the pendency of this action.

Notwithstanding this order to disclose, the prosecution never divulged the police reports prepared by Officer Morrison and Sergeant Gonzales, both of which contained relevant information relating to "Randy" Newell's possible involvement in this case.

The trial commenced on October 11, 1977. Mr. Smith's defense at trial was alibi and insufficient proof to implicate him in these crimes. On October 17, 1977, the trial court declared a mistrial due to the jurors' inability to reach a unanimous verdict.

In November 1977, prior to Mr. Smith's January 30, 1978 retrial,[16] Mr. Lucero withdrew from the case because of a dispute as to his use of the retained funds in preparing Mr. Smith's defense. As a result, Mr. Harris represented Mr. Smith by himself during the retrial. Prior to the start of the retrial, Harris, who had prepared a written motion seeking disclosure of the arrest and conviction records of three witnesses for the prosecution, Mr. Hume, Ms. Thompson, and "Randy" Newell, filed that motion in open court.[17] The court made a handwritten ruling on the motion, which stated: "Filed in open court on 1/31/78. . . . Denied as to arrests—previously defendant previous told by D.A. no convictions as to any of these [signed] Cole D.J." The court's order, which is somewhat illegible,[18] was made in reliance on a representation to the court made by Mr. Anuskewicz that "Randy" Newell had no prior convictions. Mr. Anuskewicz later testified he based this representation on the absence of a rap sheet on Newell in the file and Ms. Ferrara's failure to tell him anything about Mr. Newell having a record.

During his retrial, Mr. Smith maintained the same defenses he asserted at his first trial. By this time, the prosecution was on notice of the essence of Mr. Smith's defenses, which were alibi coupled with what was characterized in his opening statement as proof that the prosecution's evidence strongly suggested "someone else" had as much of a reason, if not more of a reason, to have committed these crimes. Mr. Harris did not refer to this other person by name, but it was

---

**16.** The prosecution opted only to retry Mr. Smith and did not retry Mr. Bylsma. The reasons for this decision are not clear from the record.

**17.** Mr. Lucero's motion for the police reports, which was filed prior to the commencement of the first trial, also requested records of prior convictions of any individual to be called as a witness for the prosecution.

**18.** Although the judge's handwritten notation is somewhat illegible, our understanding of the court's ruling appears to be accurate in all material respects. Moreover, the State's acquiescence in this understanding of the court's ruling demonstrates its good faith willingness to acknowledge that this is a fair statement of the court's ruling.

obvious he was insinuating it was "Randy" Newell.

On February 4, 1978, the jury returned a verdict acquitting Mr. Smith on the kidnapping counts but convicting him on both counts of first degree murder. At around this time, "Randy" Newell had moved into a house with Celia Payne and Mark Hopkins. On March 5, 1978, four days before Mr. Smith was to be sentenced, Newell was found lying on the floor of their house, with needle marks in his arms. The medical examiner's office later determined Newell had died from a drug overdose.[19]

On March 9, 1978, the trial judge sentenced Mr. Smith to two consecutive terms of life imprisonment. Mr. Smith, with Mr. Harris' assistance, filed a notice of appeal in the state supreme court[20] on March 20, 1978, asserting fourteen claims of error. On February 27, 1979, the New Mexico Supreme Court affirmed Mr. Smith's convictions. *See State v. Smith*, 92 N.M. 533, 591 P.2d 664 (1979). The mandate was issued on March 16, 1979.

### F.  State Court Evidentiary Hearing

On September 27, 1982, Mr. Smith, through new counsel Alice Hector, filed a motion in the New Mexico Supreme Court seeking a recall of the mandate, a withdrawal of the opinion and reconsideration on the merits. This request was prompted by the Supreme Court's refusal to address two of Mr. Smith's claims of error in his direct appeal because Harris, his counsel, failed to provide the appellate court with the necessary transcripts, thereby resulting in a waiver of those issues.[21] *See Smith*, 92 N.M. at 536–37, 591 P.2d at 667–68. The Supreme Court denied the motion on October 8, 1982.

█  Mr. Smith's counsel continued to investigate this case, presumably in anticipation of filing a motion for post-conviction relief. In the latter part of 1982 and into early 1983, Mr. Smith's counsel's investigation revealed the prosecution may have failed to disclose several pieces of evidence, all of which related to Mr. Smith's defense that someone else—"Randy" Newell—committed these crimes. The specific evidence in question was the clothing taken from "Randy" Newell's car, the police reports indicating Mr. Newell's status as a suspect in the Torrance County investigation, Mr. Newell's presence on two separate occasions near the location where the bodies were found, and Mr. Newell's use of "Randy" Newell as an alias for his true name, Samuel J. Newell; the prior conviction record of Samuel J. Newell and his status as a fugitive with an outstanding arrest warrant from the State of Kansas; several statements Mr. Newell made to law enforcement personnel; Mr. Newell's ownership of a shotgun; and allegedly exculpatory statements by an individual named Linda "Crickett" Nelson.[22]

19.  Ms. Payne and Mr. Hopkins both testified at the evidentiary hearing in 1983 that "Randy" Newell had made statements to them while he was living with them admitting to his involvement in the Talton–McDonnell homicides. Ms. Payne testified at the evidentiary hearing that Mr. Newell had told her he killed Ms. Talton out of jealousy; both Ms. Payne and Mr. Hopkins testified Mr. Newell once threatened to kill Ms. Payne as he had "the other two girls." In addition, Donna Nargelovic, one of Mr. Newell's coworkers, testified Mr. Newell had made a statement to her that Mr. Talton was killed because of jealousy.

20.  New Mexico has a two-tiered appellate court system, and in the ordinary case, a direct appeal would lie to the state court of appeals with the power of discretionary review resting with the state supreme court. The New Mexico Constitution, however, mandates that an appeal from a judgment in a criminal case imposing a sentence of death or life imprisonment "shall be taken directly to the supreme court." N.M. Const. art. VI, § 2. Thus, the notice of appeal was properly filed in the state supreme court.

21.  Warren Harris' misconduct in handling Mr. Smith's trial and appeal resulted in disciplinary proceedings, and ultimately the imposition of sanctions, against him. Moreover, he was later subjected to a public censure for his failure to respond to repeated inquiries from the Disciplinary Board relating to the investigation into his handling of this case. *See Matter of Harris*, 101 N.M. 221, 221, 680 P.2d 602, 602 (N.M.1984). He was temporarily suspended from the practice of law.

22.  While we address each of these arguments separately, we note the State argued, and Mr. Smith's counsel candidly acknowledged, that the last two pieces of evidence—Mr. Newell's ownership of a gun similar to the one allegedly used to

There were apparently only two specific discovery requests made by Mr. Smith's trial counsel, both of which were granted by the trial court: one for the police reports, and one for prior arrests and convictions of the prosecution's witnesses, including "Randy" Newell.[23] Although there are conflicting statements in the various pleadings in this case, it does not appear defense counsel ever made a catchall motion with a general request for the production of "any exculpatory material." Regardless of whether such a motion was made, there was never a court order to that effect. While the significance of failing to make such a request is discussed below, it is apparent that had the prosecution responded to the specific requests which were made, namely, the police reports, the contents of those reports would certainly have alerted defense counsel to the existence of the potentially exculpatory information regarding "Randy" Newell.

On April 4, 1983, Ms. Hector, relying on the information she learned, filed a motion for post-conviction relief, also referred to as a Rule 57 motion,[24] raising *Brady* claims based on the prosecution's alleged failure to disclose exculpatory evidence, along with claims of ineffective assistance of trial and appellate counsel relating to Mr. Harris' handling of the trial and direct appeal. She attached an affidavit to the motion attesting to her investigative efforts and proffering a summary of the evidence she intended to prove in support of these claims. The same

judge who presided over Mr. Smith's trial granted Mr. Smith's request for an evidentiary hearing on these issues. A comprehensive, but fragmented, evidentiary hearing was subsequently held whereby Mr. Smith presented his evidence during five days in July, August and September of 1983, and the State presented its case during two days in December of 1983. There was a significant amount of testimony adduced at this hearing. Mr. Smith called numerous witnesses, including the two prosecutors who handled his trial and many of the law enforcement personnel involved in the investigation of the Talton–McDonnell homicides.

Mr. Smith's first witness was lead prosecutor Roy Anuskewicz. When asked about Officer Morrison's report detailing several pieces of information regarding "Randy" Newell, including his status as a suspect, that he was seen in the area where the bodies were found on two occasions, and that the clothes were taken from his car, Mr. Anuskewicz stated he could not recall if the report had been disclosed or if it was in fact in Mr. Smith's file at that time. He further stated the Bernalillo County district attorney's office had in place an "open file" policy, whereby defense counsel could review a prosecutor's entire file upon request. Mr. Anuskewicz testified:

> I didn't go through [the file], mull through it, and say "Oh, this is exculpatory, this isn't." You know, if we have a police re-

---

commit these crimes and the statements of Ms. Nelson—were not raised in the briefs before the district court and therefore should not be considered on appeal. We agree these issues were not presented to the district court in the first instance, and that in the absence of extraordinary circumstances to the contrary, we will not consider such issues for the first time on appeal. *See, e.g., Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) ("[i]t is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Lyons v. Jefferson Bank & Trust,* 994 F.2d 716, 720–22 (10th Cir.1993) (discussing the policies behind this rule). In this case, because we believe consideration of these two issues would not alter or affect our conclusion, we adhere to the general rule and do not consider these claims for the first time on appeal.

**23.** In fact, there were two specific requests for conviction records of State's witnesses. Mr.

Lucero filed one such motion prior to the first trial and Mr. Harris filed one prior to the second trial.

**24.** Throughout the pleadings, this motion is referred to by several names, the most frequent of which is the "Rule 57" motion. Although the State of New Mexico has long since amended its rules of procedure and the names accorded to particular post-trial motions, it appears that a Rule 57 motion was similar to either a motion to vacate, set aside or correct a sentence or a motion for a new trial based on newly discovered evidence. *See State v. Peppers,* 110 N.M. 393, 396, 796 P.2d 614, 617 (Ct.App.1990) (discussing the precursor and successor rules to Rule 57). In addition to Rule 57 motions, a criminal defendant could also seek recourse by filing a state petition for a writ of habeas corpus. *See id.* at 395–97, 796 P.2d at 616–18. This motion was in essence a petition in state court seeking relief from a conviction due to constitutional error.

port in the file, we have a search warrant, we—whatever it may be, you know, its an open file. They can come in and see it; you know, it solves some of the—so you—you know, I, I was—I hate making those decisions, you know, its a difficult question.

Ms. Ferrara acknowledged Officer Morrison's report and Sergeant Gonzales' report, regarding "Randy" Newell being known as Samuel J. Newell, were never disclosed to Mr. Smith's counsel. Doug Henson, counsel for the State during this hearing, stipulated Officer Morrison's report was not in the Smith file while he was preparing for this hearing, although he did not comment on whether it was in the file at the time of trial several years earlier. Mr. Harris testified he never received Officer Morrison's report and he was unaware of the contents of the report relating to "Randy" Newell's true identity. Mr. Harris' testimony is reinforced by the conspicuous absence of any cross-examination of Mr. Newell at trial about the material contained in Officer Morrison's report.

With respect to the clothes seized from Mr. Newell's car, Ms. Ferrara, a relatively inexperienced felony trial prosecutor at the time of Mr. Smith's trial in 1978, testified she recalled examining the bag of women's clothing taken from Mr. Newell's car in the evidence room at the Albuquerque Police Department with Mr. Anuskewicz prior to the first trial. She stated she did not believe she ever discussed the existence of these clothes with defense counsel, although she did indicate all the evidence from Newell's car was in the evidence room and it was marked with a tag stating "Articles from vehicle accident," albeit with no mention of, or connection to, "Randy" Newell.

She remembered a pair of women's underwear was seized from Mr. Newell's car. She recalled it being stained on the right front side with several spots she thought were blood. Prior to trial, she spoke with Newell about the blood stains, and he told her the stains were menstrual blood as Ms. Talton had been menstruating at that time. Ms. Ferrara testified she did not believe the stains were menstrual blood, primarily because they were situated on the right front portion of the underwear, rather than in the area where menstrual blood would ordinarily be found. Furthermore, the gunshot wound to Ms. Talton's pelvis was on her right side, the same side as the stains found on the underwear. In addition, Celia Payne, the woman with whom "Randy" Newell was living at the time he died, later testified Mr. Newell had bragged to her that the police stupidly believed his explanation that the stains were menstrual blood.

Ms. Ferrara next testified she thought it might be "helpful" to have the underwear examined in case it was introduced at trial in order to have a medical evaluation of whether the stains were in fact blood, and if so, whose blood it was. She recalled being "curious" about the stains, and she asked someone whether tests of the underwear were necessary. She said she was told not to worry about having the underwear tested since it was probably the same substance on the man's clothing which had been tested and which was found not to be blood. She acknowledged no tests were ever done on the underwear and that it, along with the rest of the clothes, was destroyed before any further testing could be performed.

Ms. Ferrara admitted she did not realize at the time of trial that she had authority to order the police department to test the clothing. In hindsight, however, she acknowledged she did in fact possess such authority, although she still did not think "that was her role in this whole case, to have that done." There was additional testimony that at the time of trial, scientific testing was available to differentiate between menstrual and non-menstrual blood.

Mr. Harris testified he was never informed of the existence of these clothes, and if he had been so advised, he would certainly have investigated this issue in more detail by interviewing Officer Ferguson and others who had seen the clothes as well as contacting an independent expert if necessary. He testified this information would have made a "tremendous" difference in his trial preparation strategy.

Another critical issue at the evidentiary hearing surrounded the true identity of "Randy" Newell and whether and when the

prosecution knew about his true identity. In fact, "Randy" Newell's real name was Samuel J. Newell. While he was living in New Mexico, he used the name "Randy," his brother's name, in an effort to conceal his real identity. Samuel J. Newell used the name "Randy" as an alias because he was a fugitive for whom an arrest warrant had been issued on August 14, 1974, by the authorities in Sedgwick County, Kansas. The warrant was based on Samuel J. Newell's failure to complete a drug addiction program and for his unauthorized leave from the treatment facility. In addition to being a fugitive, it was subsequently learned Samuel J. Newell was a twice-convicted felon, having pled guilty to two separate counts of burglary in Kansas in December of 1972 and March of 1973.

Whether the prosecution knew "Randy" Newell was actually Samuel J. Newell, and if so, when they obtained this knowledge, were hotly contested issues during this evidentiary hearing. In an effort to show the prosecution knew prior to the end of the retrial, Mr. Smith relied on Sergeant Gonzales' police report, dated August 16, 1977, in which he stated a Mrs. Pitchford indicated that "Randall Newell was also known as Samuel J. Newell." Mr. Smith also introduced the testimony of Detective Archie Borunda of the Albuquerque Police Department who stated he told the prosecution that "Randy" Newell was actually Samuel J. Newell. Detective Borunda testified once he learned this information, he obtained a rap sheet on Samuel J. Newell. The rap sheet indicated the prior convictions discussed above, and Detective Borunda stated he gave a copy of that rap sheet to the prosecution. As for the timing of when this information was allegedly conveyed to the prosecution, Detective Borunda stated, "I don't know how early in the investigation it became known—that Randy Newell was actually Samuel Newell, but it was during one of the trials that it was known. In fact, it was in the reports that that was his real name." [25] Detective Borunda later reiterated he could not remember precisely when this information was given to the pros-

ecution; however, he was certain it was during one of Mr. Smith's trials and before the end of the retrial.

In addition to the two prior convictions for burglary as Samuel J. Newell, Ms. Ferrara's trial preparation notes reflect "Randy" Newell stated he had "completed 2 yrs + 2 yrs probation" for "Poss/Sales of MDA (Wichita)" in 1972. Preceding this information, Ms. Ferrara had written the word "Felonies." When she was asked about this notation at the evidentiary hearing, Ms. Ferrara admitted this information had not been disclosed to the defense but stated the reason for not disclosing it was because it could not be verified. She was, in other words, unable to determine if "Randy" Newell had actually been convicted of such a crime. Ms. Ferrara stated that based on this lack of verification, she assumed it was merely an arrest and not a conviction, although she recognized it was a bit unusual for someone not to know if they had been convicted of a crime in the past. Without ever following up on this issue, Mr. Anuskewicz represented to the trial court that "Randy" Newell had no prior convictions with respect to the defense's motion for disclosure of conviction records.

Mr. Anuskewicz testified he did not know "Randy" Newell's true name was Samuel J. Newell; however, he also said he was familiar with the entire file in this case, which presumably would have included Sergeant Gonzales' report regarding Ms. Pitchford's statement, which he was "sure" he had read in preparation for trial.

Mr. Harris testified he was never informed "Randy" Newell was actually Samuel J. Newell, even though the court had ordered the prosecution to disclose, *inter alia*, police reports in this case. Moreover, because Harris never learned of Newell's true identity, he stated he did not know about his fugitive status or his prior convictions either.

Yet another important issue at this hearing involved four statements "Randy" Newell made to Sheriff Chavez, Sergeant Gonzales, Detective Borunda and an employee of the

---

**25.** The "reports" Detective Borunda was referring to was actually Sergeant Gonzales' report containing the statement of Ms. Pitchford.

Medical Examiner's Office. The prosecution had knowledge of these statements, as Ms. Ferrara's pretrial notes regarding "Randy" Newell specifically noted he had given a tape recorded statement to Sheriff Chavez, as well as statements to Detective Borunda, and to someone in the Medical Examiner's Office. Mr. Newell's statement to Sergeant Gonzales was referenced in a supplemental report prepared by Sergeant Gonzales on September 15, 1977. While the precise contents of each of these statements has never been specifically identified, several excerpts from them were known, including "Randy" Newell's statement to Sergeant Gonzales that the blood on the women's underwear was menstrual blood.

Mr. Anuskewicz testified he did not recall ever turning over a copy of any of these statements to defense counsel. He also did not recall ever seeing a transcription of the tape recorded statement given to Sheriff Chavez. Mr. Anuskewicz referred to a letter sent by Mr. McDevitt to Mr. Lucero, dated October 3, 1977, which advised Mr. Lucero of the district attorney's open file policy. The letter further indicated Sheriff Chavez had taken a tape recorded statement from "Randy" Newell. It indicated that the statement had not been provided to the prosecution and if the defense wanted the statement, it should obtain it by subpoena.

Mr. Harris testified he was never advised of the existence of these statements, which he indicated would have been useful for both investigative and impeachment purposes. As to the former, if Harris had been apprised of the existence of these statements, specifically the statement by Mr. Newell to Sergeant Gonzales as to the blood on the clothing being menstrual blood, this would have raised a red flag in his mind and alerted him to the existence of the clothes taken from Mr. Newell's car. As to the latter, attorney Ray Twohig testified as to the importance to attorneys of having witness statements prior to trial because of the value such statements serve in attempting to impeach a witness by highlighting the discrepancies among the statements.

■ On February 24, 1984, after all the evidence had been received, the state trial court issued its thirteen-page opinion detailing its findings of fact and conclusions of law.[26] The court considered Mr. Smith's evidence but concluded he had not shown any improper conduct by the prosecution nor had he demonstrated any entitlement to relief. The gravamen of the state court's findings was Mr. Smith or his attorneys had actual knowledge of some of this information and it was therefore not withheld; that all of the alleged *Brady* evidence was made available to defense counsel by way of the prosecution's "open file" policy, but that in any event, the evidence was not exculpatory; and that Harris provided Mr. Smith with competent representation.

### G. *Subsequent State Court Proceedings*

Undeterred, Ms. Hector then sought a state petition for a writ of habeas corpus by filing a civil action on May 29, 1984, against the warden, the person with "custody" over Mr. Smith. In his petition, Mr. Smith claimed he "was denied a fair trial and [he was] being illegally detained in violation of his constitutional right to a fair trial and due process of law." He also requested another evidentiary hearing.

The State responded to the court's order to show cause by filing a motion to preclude an evidentiary hearing and to dismiss the petition. The basis for the former motion, as set forth in the State's brief in support thereof, was Mr. Smith had already received a full and fair hearing on the identical issues at his Rule 57 hearing. The State conceded this was an issue of first impression in New Mexico but argued the court nonetheless should deny what was in essence a duplicative hear-

---

26. While the statutory presumption of correctness requires us to defer to the state court's underlying findings of fact, Mr. Smith's *Brady* claims and his ineffective assistance claims both involve mixed questions of law and fact subject to *de novo* review. *See Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (ineffective assistance claims); *Bowen v. Maynard*, 799 F.2d 593, 610 (10th Cir.) (*Brady* claims), *cert. denied*, 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986). Therefore, the state trial court's ultimate conclusions of law are not binding on us.

ing on the same claims. On February 5, 1985, a different state trial judge denied the State's motion and was fully prepared to proceed with the hearing.

That same day, however, the State sought to challenge this ruling by filing an original proceeding in the New Mexico Supreme Court seeking a writ of prohibition. The New Mexico Supreme Court temporarily enjoined the state trial court from proceeding with this hearing in order to allow briefing and argument. On October 28, 1985, the New Mexico Supreme Court agreed with the State's position and held the state trial court was "without jurisdiction to grant an evidentiary hearing in the instant case." *State ex rel. Sullivan v. Kaufman,* 103 N.M. 410, 413, 708 P.2d 322, 325 (1985). Accordingly, it granted a permanent writ of prohibition against the state trial judge preventing him from holding another evidentiary hearing as to the claims for which the Rule 57 hearing was held. *Id.* The mandate was issued on November 12, 1985.

While this order resolved the question of Mr. Smith's right to a hearing, it did not deal with the merits. It was not until April 10, 1987, that yet another state trial judge summarily dismissed Mr. Smith's state petition for a writ of habeas corpus on the merits. Discretionary review of the ruling on the merits was sought in the New Mexico Supreme Court on May 11, 1987, but the court denied review nine days later.

### H. *Federal Habeas Corpus Review by the District Court*

On March 3, 1988, attorneys Alice Hector and Lewis Fleishman filed a petition on behalf of Mr. Smith in federal district court in New Mexico seeking a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Mr. Smith reasserted his *Brady* claim and his ineffective assistance of trial counsel claim. He also filed a motion requesting an evidentiary hearing on his ineffective assistance of *appellate* counsel claim, contending the record was inadequately developed to permit meaningful review of this

claim. The matter was referred to a magistrate judge who determined the claims in Mr. Smith's petition were in fact exhausted and were not amenable to summary disposition. The court then established a briefing schedule for the merits of the claims raised in the petition.

On May 24, 1993, the magistrate judge issued a thirteen-page report and recommendation, making findings similar to those made by the state trial court after its Rule 57 post-conviction hearing. Specifically, the magistrate judge found, with respect to the *Brady* claims, although there may have been evidence that *law enforcement* knew "Randy" Newell was actually Samuel Newell, "[t]here is no indication that the *prosecutors* were aware of Newell's true identity." (Emphasis added.) The court then found "there is no indication the State *knowingly* failed to disclose information" (emphasis added), or that the prosecution "*intentionally* kept [evidence] from him" (emphasis added). The court also stated "[s]imply because one county's investigation disclosed certain information, it does [not] [27] follow that this information can be imputed to a different county's investigation since both counties are under the umbrella of the State of New Mexico." Stated alternatively, the magistrate judge concluded the "Bernalillo County investigation superseded the preliminary one of Torrence [sic] County." In addition, to the extent any of the evidence regarding "Randy" Newell being Samuel Newell was exculpatory, the court concluded it would only have been probative for impeachment purposes and it would have merely been cumulative. As for the ineffective assistance of trial counsel claim, the court concluded Mr. Harris' representation at trial was not ineffective because it was the product of thorough investigation, it involved effective examination of witnesses and legitimate tactical decisions. Finally, the court summarily denied Mr. Smith's request for an evidentiary hearing on the ineffective assistance of appellate counsel claim, concluding Mr. Smith failed to carry

---

**27.** It is clear from the context of the magistrate judge's report and recommendation that the

word "not" was inadvertently omitted.

his burden of demonstrating a hearing was warranted.

Mr. Smith then filed timely objections to the magistrate judge's report and recommendation pursuant to 28 U.S.C. § 636(b)(1), taking issue primarily with the magistrate judge's disposition of the *Brady* claims. The district court explicitly stated it conducted a *de novo* review of those portions of the record to which an objection was raised, a statement we accept at face value. *See Andrews v. Deland,* 943 F.2d 1162, 1171 (10th Cir. 1991), *cert. denied,* 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992). The district court, however, overruled Mr. Smith's objections, adopted the magistrate judge's recommendation, and dismissed the petition with prejudice. Because Mr. Smith objected to the report and recommendation, he preserved his right to renew his objections on appeal. *See Moore v. United States,* 950 F.2d 656, 659 (10th Cir.1991).

## I. *Procedural Issues on Appeal*

Mr. Smith, once again represented by new counsel, assistant federal public defender Stephen P. McCue, filed a timely notice of appeal challenging the district court's adverse ruling denying his petition for relief. Before turning to the merits of Mr. Smith's claims, however, we must address two threshold procedural issues. The first involves a jurisdictional matter regarding the availability of a certificate of probable cause to appeal, and the second relates to the procedural prerequisites for federal habeas corpus review.

### 1. Certificate of Probable Cause

■ 28 U.S.C. § 2253 provides, in relevant part, "[a]n appeal [of an order denying a petition for a writ of habeas corpus] may not be taken to the court of appeals ... unless the ... judge who rendered the order or a circuit justice or judge issues a certificate of probable cause." The district court declined to issue a certificate of probable cause to

appeal, finding "no substantial issue of law for review." Because "[t]he statutory certificate of probable cause is a jurisdictional prerequisite to appeals from final orders in habeas corpus proceedings," *Ramsey v. Hand,* 309 F.2d 947, 948 (10th Cir.1962) (per curiam),[28] *cert. denied,* 373 U.S. 940, 83 S.Ct. 1547, 10 L.Ed.2d 695 (1963), we must determine whether Mr. Smith has in fact made the requisite showing of an entitlement to a certificate of probable cause to appeal. If he has, then we are authorized under § 2253 to issue a certificate of probable cause to appeal, and upon its issuance, petitioner "must then be afforded an opportunity to address the underlying merits." *Garrison v. Patterson,* 391 U.S. 464, 466, 88 S.Ct. 1687, 1688, 20 L.Ed.2d 744 (1968) (per curiam); *see also Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394–95, 77 L.Ed.2d 1090 (1983). If, however, there has not been a sufficient showing of an entitlement to a certificate of probable cause to appeal, then we are without jurisdiction to consider this appeal. *See Ramsey,* 309 F.2d at 948.

There is no automatic right to appeal a district court's order denying federal habeas corpus relief. By enacting § 2253, Congress authorized a conditional right to appeal, conditioned on the habeas petitioner first obtaining a certificate of probable cause. *See* 28 U.S.C. § 2253. This requirement furthers the salutary purpose of weeding out frivolous appeals, *see Barefoot,* 463 U.S. at 892–93, 103 S.Ct. at 3394–95 (the "primary means of separating meritorious from frivolous [habeas corpus] appeals should be the decision to grant or withhold a certificate of probable cause"), by placing the burden on the habeas petitioner to make a threshold showing that the issues sought to be raised on appeal are at least arguably meritorious. *See id.*

■ In *Gallagher v. Hannigan,* 24 F.3d 68 (10th Cir.1994), we discussed the criteria courts should look to in evaluating whether a certificate of probable cause is warranted. In general, a habeas petitioner who fails to obtain relief in the district court should be

---

**28.** *See* Fed.R.App.P. 22(b) ("In a habeas corpus proceeding in which the detention complained of arises out of process issued by a state court [i.e., pursuant to 28 U.S.C. § 2254], an appeal by the applicant for the writ *may not proceed unless* a

district or a circuit judge issues a certificate of probable cause.... If the district judge has denied the certificate, the applicant for the writ may then request issuance of the certificate by a circuit judge.") (emphasis added).

permitted to appeal that disposition only upon a "substantial showing of the denial of an important federal right by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings." *Id.* at 68 (citing *Barefoot,* 463 U.S. at 893 & n. 4, 103 S.Ct. at 3394–95 & n. 4).

In the present case, we believe the briefs demonstrate Mr. Smith has carried this threshold burden by making a satisfactory showing that the issues he seeks to raise are arguably meritorious and that they warrant further proceedings. Moreover, given the purpose of the requirement that a petitioner obtain a certificate of probable cause to appeal, we do not find that the claims are frivolous such that Mr. Smith should be denied appellate review of the district court's order denying his petition. Therefore, we grant his request for a certificate of probable cause to appeal.

**29.** Mr. Smith's claim of ineffective assistance of appellate counsel relates to Mr. Harris' representation in Mr. Smith's direct appeal to the New Mexico Supreme Court after his conviction. As noted above, the New Mexico Constitution mandates that an appeal from a judgment imposing a sentence of death or life imprisonment "shall be taken directly to the supreme court." N.M. Const. art. VI, § 2. This appeal was therefore a direct appeal as of right, and not a ruling after a grant of discretionary review, even though the appeal was to the state supreme court and not the state intermediate court of appeals. Accordingly, it is clear Mr. Smith did in fact have a constitutional right to the effective assistance of counsel on appeal. *See Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985) (noting the Sixth Amendment right to counsel during a criminal defendant's first appeal as of right recognized in *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) encompasses the right to *effective assistance* of counsel during that appeal).

Mr. Smith is not challenging his representation during any of his collateral proceedings, either state or federal, presumably in recognition of the fact that he has no Sixth Amendment right to counsel during such proceedings. *See, e.g., Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991); *Pennsylvania v. Finley,* 481 U.S. 551, 555–56, 107 S.Ct. 1990, 1993–94, 95 L.Ed.2d 539 (1987) (because precedent holds a criminal defendant has no constitutional right to counsel beyond the first appeal of right, there is no right to counsel, and thus, no right to effective assistance of counsel, during proceedings collaterally attacking the va-

## 2. Exhaustion

Having thus concluded we have jurisdiction over Mr. Smith's appeal, we next address whether his petition has satisfied the nonjurisdictional, but nonetheless important, procedural prerequisites to federal habeas corpus review.

At the time of his direct appeal, the three claims Mr. Smith now raises in federal court—*Brady* violations, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel [29]—were unavailable to him. In his state petition for post-conviction relief, however, he was permitted to, and did in fact, litigate these three claims on the merits. Thus, he has undoubtedly exhausted these claims by fairly presenting them to the state courts, *see, e.g., Rose v. Lundy,* 455 U.S. 509, 518–20 (1982), and they are therefore ripe for federal habeas corpus review.[30]

lidity of a conviction). This is true because the Sixth Amendment right to counsel applies only to criminal proceedings, *see Maine v. Moulton,* 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985), and habeas corpus proceedings are civil in nature, *see Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987), as our sister circuits have properly recognized. *See, e.g., Hoggard v. Purkett,* 29 F.3d 469, 471 (8th Cir.1994); *Barkauskas v. Lane,* 946 F.2d 1292, 1294 (7th Cir.1991).

**30.** One final comment regarding the procedural stature of this case is in order before turning to a discussion of the merits. Rule 9(a) of the Rules Governing § 2254 Proceedings "provides the state with an equitable defense to *unjustifiably* delayed petitions." *Hannon v. Maschner,* 845 F.2d 1553, 1555 (10th Cir.1988) (emphasis added). The State of New Mexico, however, has never, either in its brief or at oral argument, asserted prejudice in its ability to respond to Mr. Smith's claims due to the fact that this case is over seventeen years old.

This defense of prejudice in the ability to respond is equitable in nature, akin to laches. *See, e.g., Walters v. Scott,* 21 F.3d 683, 686 (5th Cir. 1994) ("Rule 9(a) codifies the equitable doctrine of laches as applied to habeas corpus petitions.") (footnote omitted); *Smith v. Duckworth,* 910 F.2d 1492, 1494 (7th Cir.1990) (citing cases). *But cf. Heflin v. United States,* 358 U.S. 415, 420, 79 S.Ct. 451, 454, 3 L.Ed.2d 407 (1959) (stating that under 28 U.S.C. § 2255, "there is no statute of limitations, no *res judicata,* and ... the doctrine of laches is inapplicable.") (Stewart, J., concur-

## II. DISCUSSION

We now turn to the merits of Mr. Smith's arguments on appeal, beginning with his claim that the prosecution failed to disclose various pieces of material exculpatory evidence. We start with an overview of the *Brady* doctrine.

### A. The *Brady* Doctrine

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97; *accord United States v. Buchanan*, 891 F.2d 1436, 1440 (10th Cir. 1989), *cert. denied*, 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990). "This oft-quoted language established the prosecutor's broad duty to disclose exculpatory material to the defense." *Buchanan*, 891 F.2d at 1440.

The disclosure principles of *Brady* are not rooted in the discovery rules of the Federal Rules of Criminal Procedure. *See United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976); *United States v. Bonnett*, 877 F.2d 1450, 1459 (10th Cir.1989) ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation" (citations omitted)). Rather, they are grounded in the constitutional guarantee of due process of law contained in the Fifth and Fourteenth Amendments of the Constitution.[31] *See Agurs*, 427

ring). Therefore, we view this defense of prejudice in the ability to respond as an affirmative defense which, if not pled, as in the case at bar, is waived. *See Bragan v. Morgan*, 791 F.Supp. 704, 717 n. 14 (M.D.Tenn.1992), cited in 8C Moore's Federal Practice § 14.09[2] n. 5; *cf.* Fed.R.Civ.P. 8(c) (laches is an affirmative defense). In addition, the fact that the State may be prejudiced if it is required to retry Mr. Smith is irrelevant to a Rule 9(a) defense. *Hannon*, 845 F.2d at 1556) (citing *Vasquez v. Hillery*, 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986)). The prejudice inquiry under Rule 9(a) is limited to prejudice in the State's ability to respond to the allegations in the petition because of petitioner's delay in filing it, and not prejudice to the State's ability to retry the petitioner. *See Hannon*, 845 F.2d at 1555–56 (discussing *Vasquez*, 474 U.S. at 265, 106 S.Ct. at 624); *cf. United States v. Nahodil*, 36 F.3d 323, 327–28 (3d Cir.1994) (prejudice to the government's ability to retry the defendant "is not a consideration when ruling upon a § 2255 motion.").

Although prejudice is not an issue in this case, we feel compelled to point out we would likely reject such a claim because we do not believe the lapse of time in bringing the federal petition in this case was either inexcusable or inordinate. In fact, although Mr. Smith has been litigating his appeals for over seventeen years, almost one third of that time has been spent waiting for a disposition by the two federal magistrate judges who handled this case. In addition, post-conviction proceedings in New Mexico state court took three years to complete, although half the delay there is attributable primarily to collateral procedural litigation before the New Mexico Supreme Court regarding the writ of prohibition; the other half of that three-year delay is, however, unexplained. In federal court, the federal magistrate judges took in excess of five years and two months to issue a report and recommendation on Mr. Smith's federal petition.

We recognize this case, like many habeas corpus cases, has a voluminous record requiring a great deal of time and attention. Some of the delay before the federal district court was attributable to the numerous extensions of time requested by both sides; however, some of the delay, including a lapse of over two and a half years from August 1990 to May 1993, is unexplained. We reaffirm our disapproval of such inordinate and unreasonable delays in the absence of some reasonable explanation why it was necessitated. "Plainly, 'the writ of habeas corpus, challenging detention, is reduced to a sham if the trial courts do not act within a reasonable time.'" *Johnson v. Rogers*, 917 F.2d 1283, 1284 (10th Cir.1990) (quoting *Jones v. Shell*, 572 F.2d 1278, 1280 (8th Cir.1978)). While the record does not indicate all the reasons for the delays, we reiterate our prior rejection of a defense based on docket congestion. *See Johnson*, 917 F.2d at 1284–85 (granting a writ of mandamus based on fourteen-month delay); *id.* at 1284 (the writ of habeas corpus is "intended to afford a swift and imperative remedy in all cases of illegal restraint or confinement." (Citations omitted)).

Furthermore, Rule 4 of the Rules Governing § 2254 Proceedings provides a petition for habeas corpus relief "shall be presented *promptly* to a judge of the district court" and that the petition "shall be examined *promptly* by the judge to whom it is assigned." While we are all too familiar with the overwhelming number of prisoner law suits and the burden they place on the district courts and their dockets, the fact remains these suits, which involve an individual's liberty, must receive an appropriate degree of attention. We are confident, however, that this case is an aberration and that the circumstances presented here are unlikely to recur in the future.

**31.** Because a *Brady* claim is in fact a due process claim, it is clear that we are empowered, under

U.S. at 107, 96 S.Ct. at 2399; *Brady*, 373 U.S. at 86, 83 S.Ct. at 1196. The essence of the *Brady* rule is the proposition that nondisclosure of material exculpatory evidence violates a defendant's due process right to a fair trial. *See, e.g., United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985) ("The *Brady* rule is based on the requirement of due process.") (opinion of Blackmun, J.); *United States v. Robinson*, 39 F.3d 1115, 1118 (10th Cir.1994) ("Due process mandates disclosure"); *United States v. Fleming*, 19 F.3d 1325, 1330 (10th Cir.) (same),[32] *cert. denied*, —— U.S. ——, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994).

■ We must be cognizant of the fact that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Agurs*, 427 U.S. at 110, 96 S.Ct. at 2401; *see also Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982) ("[T]he touchstone of due process analysis in cases [alleging a *Brady* violation] is the fairness of the trial, not the culpability of the prosecutor."). As a result, it is irrelevant for *Brady* purposes " 'whether the nondisclosure was a result of negligence or design.' " *Buchanan*, 891 F.2d at 1442 (quoting *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)); *see also Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97 (noting that suppression of material exculpatory evidence violates due process "irrespective of the good faith or bad faith of the prosecution"); *United States v. Pedraza*, 27 F.3d 1515, 1527 (10th Cir.1994) (same), *cert. denied*, —— U.S. ——, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994); *United States v. Montoya*, 716 F.2d 1340, 1345–46 (10th Cir. 1983).

■ The purpose of *Brady* "is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *Bagley*, 473 U.S. at 675, 105 S.Ct. at 3379–80. *Brady* and its progeny are thus grounded in notions of fundamental fairness and they embody a practical recognition of the imbalances inherent in our adversarial system of criminal justice. *See, e.g., Bagley*, 473 U.S. at 692–95, 105 S.Ct. at 3388–90 (Marshall, J., dissenting). To compensate for these imbalances, *Brady* represents a "limited departure from a pure adversary model" in the interest of promoting and enhancing the search for truth. *Bagley*, 473 U.S. at 675 n. 6, 105 S.Ct. at 3379–80 n. 6; *see also United States v. Abello–Silva*, 948 F.2d 1168, 1180 (10th Cir.1991) ("The government's hand is stacked with cards the defense lacks."), *cert. denied*, —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992). Equally important, *Brady* acknowledges "that the prosecutor's role transcends that of an adversary" because the prosecutor, acting as the representative of the sovereign, has an obligation to ensure " 'not that it shall win a case, but that justice shall be done.' " *Bagley*, 473 U.S. at 675 n. 6, 105 S.Ct. at 3379–80 n. 6 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)); *see also Brady*, 373 U.S. at 87–88, 83 S.Ct. at 1196–97.

■ Of course, the *Brady* principle has limitations. The Constitution, as interpreted in *Brady*, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant. *See, e.g., Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972) ("We know of no constitutional

the appropriate circumstances, to grant federal habeas corpus relief "on the ground that [the petitioner] is in custody in violation of *the Constitution* ... of the United States." 28 U.S.C. § 2254(a) (emphasis added).

**32.** *Brady* relied on earlier Supreme Court cases holding "rudimentary demands of justice" were offended by the prosecution's failure to disclose evidence showing that a conviction was obtained through the knowing use of perjured testimony. *See, e.g., Pyle v. Kansas*, 317 U.S. 213, 216, 63 S.Ct. 177, 178–79, 87 L.Ed. 214 (1942) (citing

*Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341–42, 79 L.Ed. 791 (1935)). In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court extended *Mooney* and held "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 269, 79 S.Ct. at 1177. Thus, the grounding of *Brady* in the requirements of due process was merely an extension of prior case law. *See generally Bagley*, 473 U.S. at 679 n. 8, 105 S.Ct. at 3382 n. 8 (discussing the case law upon which *Brady* rested).

requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."); *United States v. Comosona*, 848 F.2d 1110, 1115 (10th Cir.1988) ("The Government has no obligation to disclose possible theories of the defense to a defendant."). Due process only requires the disclosure of material exculpatory evidence which, "if suppressed, would deprive the defendant of a fair trial." *Bagley*, 473 U.S. at 675, 105 S.Ct. at 3380. Therefore, in order to establish a *Brady* violation, the defendant bears the burden [33] of establishing: "1) that the prosecution suppressed evidence; 2) that the evidence was favorable to the accused; and 3) that the evidence was material." *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir.1994) (citing *United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir.1993)); *accord Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir.1994). We address the guiding legal principles governing each of these requirements in turn.

### 1. Suppression of Evidence

The first element requires proof that the "prosecution" suppressed or withheld the evidence in question. Several issues are particularly relevant to the determination in the case at bar of whether specific evidence was suppressed or withheld. First, as indicated above, the term "suppression," in the *Brady* context, does not require a finding of bad faith or any other culpable state of mind on the part of the prosecutor.[34] *See Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. Second, the prosecutor is the party who is ultimately accountable for the nondisclosure of evidence. *See Giglio*, 405 U.S. at 154, 92 S.Ct. at 766. Third, the "prosecution" for *Brady* purposes encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, *see id.*, as well as law enforcement personnel and other arms of the state [35] involved in investigative aspects of a particular criminal venture. Logically, then, it follows that because " ' "investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure." ' " *Buchanan*, 891 F.2d at 1442 (quoting *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir.1989) (quoting *United States v. Butler*, 567 F.2d 885, 891 (9th Cir.1978))).

Thus, while proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a *Brady* claim, such proof is by no means necessary. For purposes of *Brady*, "[k]nowledge by police or investigators is ... imputed to the prosecu-

---

**33.** It is clear the defendant bears the burden of establishing a *Brady* violation. *See, e.g., Bonnett*, 877 F.2d at 1459; *United States v. George*, 778 F.2d 556, 561 (10th Cir.1985) ("the burden is on the defendant to establish the failure to disclose was violative of his due process rights.").

**34.** As we noted in *Fero*:

"The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. *Brady* and its progeny address exculpatory evidence still in the government's possession. [*Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ] and [*California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ] govern cases in which the government no longer possesses the disputed evidence."

*Fero*, 39 F.3d at 1472 (quoting *United States v. Femia*, 9 F.3d 990, 993 (1st Cir.1993)).

Thus, while the state of mind of the prosecutor is irrelevant to the question under *Brady* of whether the prosecution failed to *disclose* material exculpatory evidence, "the Due Process Clause requires a different result when we deal with the failure of the State to *preserve* evidentiary materi-

al of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) (emphasis added). In order to prevail on a claim that the prosecution "destroy[ed] or otherwise fail[ed] to preserve potentially exculpatory evidence, the defendant bears the burden of demonstrating that the government acted in bad faith in doing so." *Pedraza*, 27 F.3d at 1527 (citing *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337); *accord Fleming*, 19 F.3d at 1331. Because Mr. Smith has not raised a *Youngblood* claim, but only *Brady* claims, we need not concern ourselves with the prosecutor's state of mind.

**35.** "The duty to produce requested evidence falls on the state; there is no suggestion in *Brady* that different 'arms' of the government are severable entities.... 'The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney.' " *Martinez v. Wainwright*, 621 F.2d 184, 186–87 (5th Cir.1980) (quoting *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 846 (4th Cir.1964)).

tion." *Buchanan*, 891 F.2d at 1442 (citations omitted). Our recent decision in *Fero*, which reaffirmed the continuing vitality of this constructive knowledge doctrine in the *Brady* context, stated "[b]ecause the police are considered agents of the prosecution for *Brady* purposes, the fact that it was the police and not the prosecutor who misplaced the [evidence], *is irrelevant.*" *Fero*, 39 F.3d at 1472 n. 12 (emphasis added) (citing *Buchanan*, 891 F.2d at 1442); *see also Ballinger v. Kerby*, 3 F.3d 1371, 1377 (10th Cir.1993) (Kelly, J., dissenting) ("Even imputing the nondisclosure of this [evidence] to the prosecutor").[36]

### 2. Exculpatory Nature of the Evidence

■ The second element of a *Brady* claim requires proof the evidence in question was exculpatory, or favorable, to the defendant. In this regard, it is worth noting that " 'because impeachment is integral to a defendant's constitutional right to cross-examination, there exists no pat distinction between impeachment and exculpatory evidence under *Brady*.' " *Ballinger*, 3 F.3d at 1376 (quoting *Buchanan*, 891 F.2d at 1443);

accord *Hughes*, 33 F.3d at 1252. This is especially true "[w]here a witness' credibility is material to the question of guilt." *Fleming*, 19 F.3d at 1330; *see also Giglio*, 405 U.S. at 154–55, 92 S.Ct. at 766. As Justice Blackmun stated in *Bagley:*

> Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule. *See Giglio v. United States*, 405 U.S. 150, 154 [92 S.Ct. 763, 766, 31 L.Ed.2d 104] (1972). Such evidence is "evidence favorable to an accused," *Brady*, 373 U.S. at 87 [83 S.Ct. at 1196], so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. *Napue v. Illinois*, 360 U.S. 264, 269 [79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217] (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

473 U.S. at 676, 105 S.Ct. at 3380.[37] In sum, then, the fact that a particular piece of evi-

**36.** The question of how much of the knowledge possessed by various arms of the State should be imputed to the prosecution is an issue of first impression in this circuit. Clearly, if the prosecution had actual knowledge that several arms of the State were involved in the investigation of a particular case, then the knowledge of those arms is imputed to the prosecution. In the absence of actual knowledge, however, the circuits are somewhat split as to the precise contours of when knowledge by an arm of the State will be imputed to the prosecution. For example, the First and Third Circuits have taken an expansive view and have imputed a broad range of knowledge to the prosecution. *See United States v. Thornton*, 1 F.3d 149, 158 (3d Cir.) (citing *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991), for the proposition that "[t]he prosecutors have an obligation to make a thorough inquiry of all enforcement agencies that had a potential connection with the witnesses."), *cert. denied,* —— U.S. ——, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993); *United States v. Osorio*, 929 F.2d 753, 760–62 (1st Cir.1991) (recognizing a prosecutor's duty to "demand compliance with disclosure responsibilities by all relevant dimensions of government."). The Fifth Circuit has taken a more moderate approach. *See Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir.1991) ("the prosecution is deemed to have knowledge of information readily available to it"). The District of Columbia and the Ninth Circuits have not clearly defined the extent of the obligation. *See United States v.*

*Brooks*, 966 F.2d 1500, 1503 (D.C.Cir.1992) (prosecutor's duty to disclose extends to material maintained by branches of government "closely aligned with the prosecution."); *United States v. Jennings*, 960 F.2d 1488, 1490 (9th Cir.1992) (obligation on prosecution under *Brady* extends to production of "any favorable evidence in the personnel records" and citing cases that the prosecution must produce materials even if they are in the possession of another agency).

In this case, it is undisputed that the Bernalillo County district attorney's office had actual knowledge that there were two separate investigations into these homicides by the authorities in Bernalillo County and by the authorities in Torrance County. Because the prosecution had actual knowledge of the fact that these two arms of the State were investigating this case, it is reasonable to impute the knowledge possessed by each entity to the prosecution under *Brady*. Furthermore, this fact relieves us from having to determine the full extent of when knowledge possessed by an arm of the State will be imputed to the prosecution.

**37.** The case law uses the terms "favorable" and "exculpatory" interchangeably. This distinction may be traceable to an ambiguity after the *Brady* decision on the issue of whether impeachment evidence, which is arguably "favorable" but not "exculpatory" *per se*, was subject to *Brady* disclosure. Because the Supreme Court answered the

dence is probative only for purposes of impeachment is not a defense to a *Brady* claim because " '[i]mpeachment evidence merits the same constitutional treatment as exculpatory evidence.' " *Abello–Silva,* 948 F.2d at 1179 (citation omitted).

### 3. The Materiality of the Evidence

The third and final element of a *Brady* claim requires proof that the evidence was "material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97; *see also Ballinger,* 3 F.3d at 1376. "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397; *Buchanan,* 891 F.2d at 1441.

■ "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401 (footnote omitted). The Supreme Court first addressed the materiality question in *Agurs,* enunciating three different standards [38] of materiality dependent upon "the specificity of the defendant's request and the conduct of the prosecutor." *Buchanan,* 891 F.2d at 1441.

■ If the defendant made a specific request for disclosure of an identifiable piece of evidence, then the prosecution was on specific notice of what was sought. Thus, the standard of materiality should be, and was, more lenient than if the defendant made either a general request for "all *Brady* evidence" or no request at all, both of which fail to provide any descriptive notice of what is being sought. *See Bagley,* 473 U.S. at 678–83, 105 S.Ct. at 3381–84 (discussing *Agurs,* 427 U.S. at 103–12, 96 S.Ct. at 2397–2402).

■ *Agurs* specifically considered the obligation of the prosecution in cases where no request was made. Recognizing that disclosure obligations are tied to the level of notice afforded to the prosecution, the Court held:

> If there is a duty to respond to a general request . . . it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, *that duty should equally arise even if no request is made. . . . [W]e conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases . . . in which there has been no request at all.*

*Agurs,* 427 U.S. at 107, 96 S.Ct. at 2399 (emphasis added). Therefore, while it is certainly more prudent for defense counsel to at least make a "general request" for *Brady* material rather than no request at all, the failure to make any request does not relieve the prosecution of its obligation to disclose evidence with an "obviously exculpatory character."

As a practical matter, this must be true, at least in situations where defense counsel simply has no way of knowing the prosecution possesses certain exculpatory evidence. *See Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399 ("In many cases, however, exculpatory information in the possession of the prosecutor may be unknown to defense counsel."). Any other rule would penalize criminal defendants for their counsel's failure to be prescient. Moreover, if defense counsel knew the prosecution possessed particular exculpatory evidence, counsel could vitiate this entire problem by making a specific request for that evidence. It is precisely because defense

---

question in the affirmative in *Giglio,* holding impeachment evidence is subject to *Brady* disclosure, we see no significant difference between the two terms.

**38.** The Supreme Court enunciated a fourth standard of materiality for the exceptional case where the undisclosed evidence would demonstrate "the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false." *Bagley,* 473 U.S. at 678, 105

S.Ct. at 3381. In those rare situations, the evidence is presumptively material "unless failure to disclose it would be harmless beyond a reasonable doubt." *Id.* at 680, 105 S.Ct. at 3382. The justification for this presumption of materiality is that by affirmatively using perjured testimony, or by passively failing to correct what is known to be perjured testimony under *Napue,* the prosecution is participating in a "corruption of the truth-seeking function of the trial process." *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397.

counsel does not, and cannot, know what potentially exculpatory evidence the prosecution possesses that there cannot realistically be any meaningful distinction between the prosecution's obligation under *Brady* in a "general request" case and its obligation in a "no request" case. If the prosecution possesses evidence that, in the context of a particular case is obviously exculpatory, then it has an obligation to disclose it to defense counsel whether a general request is made or whether no request is made. This represents a paradigmatic example of the imbalances inherent in the criminal justice process, and it serves to illustrate the purpose behind the *Brady* doctrine.

The *Agurs* framework, however, was unnecessarily rigid and the semantic distinctions between the different standards of materiality were often difficult to apply in practice. In *Bagley*, five members of the Court, through two separate opinions, adopted a single standard of materiality "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (opinion of Blackmun, J.); *id.* at 685, 105 S.Ct. at 3385 (opinion of White, J.);[39] *see also Bowen v. Maynard*, 799 F.2d 593, 603 (10th Cir.) (discussing the three standards of materiality under *Agurs* and noting that after *Bagley*, courts are to apply "a single test ... to all instances of nondisclosure, including specific request, general request and no request cases"), *cert. denied*, 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986). Under this standard, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *accord Fero*, 39 F.3d at 1472; *Ballinger*, 3 F.3d at 1376.

Under this more flexible, sliding scale approach to assessing the materiality *vel non* of the evidence in question, the specificity of the request is inversely related to the prosecution's disclosure obligation. As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation. Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a *Brady* violation.

In making the materiality determination, "we view the suppressed evidence's significance in relation to the record as a whole," *Hughes*, 33 F.3d at 1252 (citing *United States v. Wolf*, 839 F.2d 1387, 1391 (10th Cir.), *cert. denied*, 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988)), keeping in mind that "[w]hat might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Robinson*, 39 F.3d at 1119 (citing *Agurs*, 427 U.S. at 113, 96 S.Ct. at 2402). We are also to consider "any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case ... in light of the totality of the circumstances." *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384.

We reiterate the question of "[w]hether the government was required to disclose certain evidence under *Brady* is a mixed question of law and fact which we review *de novo*." *Fleming*, 19 F.3d at 1330 (citing *Buchanan*, 891 F.2d at 1440); *Abello–Silva*, 948 F.2d at 1179. Therefore, "[t]he state court's ultimate conclusion under *Brady* ... is not entitled to a presumption of correctness under section 2254(d) and is open to review by federal courts." *Bowen*, 799 F.2d at 610 (citing *Chaney v. Brown*, 730 F.2d 1334, 1344–46 (10th Cir.1984), *cert. denied*, 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1985)); *see also Case*, 887 F.2d at 1393 ("No presumption of correctness attaches to legal

---

39. Justice Blackmun's opinion was joined by Justice O'Connor, and Justice White's concurrence, which specifically agreed with this definition of materiality, was joined by Chief Justice Burger and then-Justice Rehnquist. *See Hughes*, 33 F.3d at 1252 n. 3 (quoting *Ballinger*, 3 F.3d at 1376 n. 4); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987)

(noting that a majority of the justices of the Supreme Court have adopted the definition of materiality enunciated in *Bagley*). "Accordingly, the plurality opinion [of Justice Blackmun] may be taken to state the holding of the Court." *Waters v. Churchill*, —— U.S. ——, ——, 114 S.Ct. 1878, 1893, 128 L.Ed.2d 686 (1994) (Souter, J., concurring) (citations omitted).

conclusions or determinations on mixed questions of law and fact. Those are reviewed *de novo* on federal habeas review.").[40] Findings of fact by the district court are reviewed for clear error. *See Thomas v. Kerby,* 44 F.3d 884, 886 (10th Cir.1995) (a district court's factual findings in a habeas corpus case are reviewed for clear error) (citing *Hill v. Reynolds,* 942 F.2d 1494, 1495 (10th Cir.1991)). We must now apply these principles to the facts of the present case.

### B. Application to the Case at Bar

A review of the record in this case reveals the prosecution did in fact fail to disclose most, if not all, the evidence at issue. The State's primary defenses to Mr. Smith's claims were that the evidence was made available pursuant to the district attorney's "open file" policy, that the evidence was not withheld intentionally, or that the prosecutors did not have knowledge the evidence existed. Because these issues are largely irrelevant to *Brady* analysis, it follows that the State has not offered a legitimate defense to Mr. Smith's claims. Further, our confidence in the outcome of the trial has been seriously undermined by the cumulative effect of several of these nondisclosures. We therefore find, for reasons set forth below, Mr. Smith is entitled to federal habeas relief.

### 1. Police Reports

■ It is undisputed Mr. Smith made a specific request for police reports "relating to investigation or inquiring into circumstances surrounding these criminal complaints," and that the trial court entered an order requiring disclosure of "all police reports ... made in connection with this case." In *Agurs,* the Supreme Court warned "[w]hen the prosecutor receives a specific and relevant request,

the failure to make any response is seldom, if ever, excusable." *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399. The State argues it had an "open file" policy in place that discharged its obligation under *Brady* by making this material available to the defense. We disagree.

■ An "open file" policy is neither mandated by the Constitution, *see Moore,* 408 U.S. at 795, 92 S.Ct. at 2568, nor is it *ipso facto* constitutionally sufficient. While an "open file" policy *may* suffice to discharge the prosecution's *Brady* obligations in a particular case, it often will not be dispositive of the issue. It is not difficult to envision circumstances where the prosecution possesses, either actually or constructively, *Brady* information that for some reason is not in the "file," such as material in a police officer's file (but not in the prosecutor's file) or material learned orally and not memorialized in writing. No one could reasonably argue that under those circumstances, assuming the evidence was exculpatory, the prosecution's *Brady* obligations would be satisfied by its "open file" policy. To adopt such a holding would permit the prosecution to discharge its obligations under *Brady* by talismanically invoking the words "open file policy," and thus circumvent the purpose behind *Brady.* We believe this reading of *Brady* is too formalistic and is flawed because it fails to recognize that *Brady* material may be found in places other than a prosecutor's file. The prosecution's affirmative obligation under *Brady* may often go beyond divulging what is in "the file."[41] Thus, while a prosecution's "open file" policy is relevant and may be considered in determining whether a *Brady* violation occurred, it cannot, standing alone, be given dispositive weight.

---

**40.** In *Wright v. West,* —— U.S. ——, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), the Supreme Court reconsidered the appropriate level of deference to be accorded to state court findings on mixed questions; the Court, however, declined to resolve the issue. *See id.* at —— – ——, 112 S.Ct. at 2489–92; *see also Ballinger,* 3 F.3d at 1376 n. 3. Therefore, we continue to adhere to precedent, which mandates *de novo* review of mixed questions. *See, e.g., Fleming,* 19 F.3d at 1330 (*Brady* claims are mixed questions reviewed *de novo*); *Bowen,* 799 F.2d at 610 (same). *See*

*generally Miller v. Fenton,* 474 U.S. 104, 112–18, 106 S.Ct. 445, 450–54, 88 L.Ed.2d 405 (1985) (mixed constitutional questions are "subject to plenary federal review" on habeas).

**41.** To the extent an "open file" policy would be probative of the question of whether the prosecution acted in good faith in attempting to discharge its *Brady* obligation, we reiterate the state of mind of the prosecutor is irrelevant to the *Brady* inquiry.

### a. Officer Morrison's Report

■ In the present case, it is clear as a threshold matter that the report prepared by Officer Morrison of the New Mexico State Police, that contained information relating to "Randy" Newell's presence near the vicinity of the bodies on two separate occasions, to the clothes taken from his car and to his status as a suspect in this investigation, falls within the scope of the trial court's disclosure order. Although his report was initially necessitated by a traffic accident involving "Randy" Newell, both the contents of the report and the caption of the report indicate a relationship between the report and the Talton–McDonnell homicides. The report thus was relevant and within the umbrella of the defendant's request. The question then becomes whether it was disclosed.

■ The magistrate judge made a conclusory finding found that "[p]etitioner has not shown that the State failed to comply with its *Brady* obligation to turn over [Officer Morrison's] report." Although this finding is reviewed only for clear error, and although we are required to afford appropriate deference to the trial courts on factual matters, we must still scrutinize factual findings to insure that there is a sufficient evidentiary basis for the finding. In this case, while we do not do so lightly, we are convinced, for reasons set forth below, that this finding is clearly erroneous.

We are troubled by the fact that this "finding" of disclosure of Officer Morrison's report is unsupported by evidence in the record. In fact, the evidence in the record from the evidentiary hearing strongly suggests and supports a contrary finding, namely, that the report was not disclosed. For example, neither prosecutor had any recollection of specifically disclosing this report to Mr. Smith's counsel. Although no finding was made concerning whether this report was in the file in 1977, the State stipulated the report was not in the file in 1983. While far from conclusive, this fact tends to support a

finding of nondisclosure, especially in light of the other evidence.

Mr. Harris' testimony was also consistent with a finding of nondisclosure as he testified he never received a copy of that report. But perhaps the most highly probative evidence relating to the disclosure *vel non* of this report is the conspicuous absence of any cross-examination of Mr. Newell on the matters contained in Officer Morrison's report, matters that were extremely relevant to Mr. Smith's defense.[42] The sum total of this evidence, coupled with the sheer absence of any evidence supporting a finding of disclosure, compels us to conclude the magistrate judge's finding of disclosure of this report was clearly erroneous.

■ Moreover, there can be no doubt the evidence contained therein was "favorable" to the defense. Officer Morrison's report would have provided important investigative leads and impeachment evidence to Mr. Smith and his attorney regarding "Randy" Newell. The evidence would have permitted more thorough impeachment of a critical state's witness and would have immeasurably strengthened Mr. Smith's defense that "Randy" Newell was the perpetrator and not Mr. Smith.

■ To the extent the magistrate judge concluded this impeachment evidence would merely have been cumulative, the record provides no support for this finding and it is therefore clearly erroneous. *See Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). "Cumulative evidence" is defined as evidence "which goes to prove what has already been established by other evidence." Black's Law Dictionary 343 (5th ed. 1979). Officer Morrison's report might have been cumulative had the specific contents of it been disclosed to the defense at some other time. But, as the discussion below illustrates, the contents of the report were not disclosed nor was Mr. Newell ever impeached about any of the material contained in the report.

---

**42.** Even if Mr. Harris' testimony is self-serving, thereby weakening this aspect of Mr. Smith's *Brady* claim, testimony that Harris had the report but did not utilize it would be, at the very

least, incredible, given his defense at trial, and at most, highly persuasive evidence bearing on Mr. Smith's ineffective assistance of trial counsel claim.

Thus, the potential impeachment value of the report cannot be said to be cumulative of anything already established on cross-examination of Mr. Newell. To the contrary, disclosure of this report would have alerted counsel to the existence of the clothing and permitted defense counsel to examine the clothing found and to have it tested. Furthermore, this information, taken together with Mr. Newell's already existing motive of jealousy, which was established on cross-examination, would have undoubtedly inured to Mr. Smith's benefit.

The nondisclosure of this report, and the contents thereof, dramatically altered and limited the effectiveness of Mr. Smith's defense at trial. Additionally, while the knowledge the police were investigating Mr. Newell would arguably carry significant weight with the jury in and of itself, that fact would also have been useful in "discredit[ing] the caliber of the investigation or the decision to charge the defendant," factors we may consider is assessing whether a *Brady* violation occurred. *Bowen,* 799 F.2d at 613.

■■■ Finally, we cannot agree with the state post-conviction court and the federal district court that, in the alternative, this evidence was not "material." We repeat that the failure to disclose this report, in light of a specific request for it, is "seldom, if ever, excusable." *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399. We believe the nondisclosure of this report clearly impacted the defense's preparation and presentation of its case at trial. *See Bagley,* 473 U.S. at 683, 105 S.Ct. at 3384. In addition, given Mr. Smith's defense at trial, the significance of "Randy" Newell's testimony, and the fact that the first trial resulted in a mistrial, we believe the disclosure of this evidence, considered in light of the entire record, can reasonably be said to have affected the outcome of the retrial so as to undermine our confidence in the verdict.

### b. Sergeant Gonzales' Report

The same holds true for Sergeant Gonzales' report containing the critical information that Ms. Pitchford indicated "Randy" Newell was known as Samuel J. Newell. As we discuss below, there is evidence in the record that the prosecution learned this information from Detective Borunda. Detective Borunda stated he told the prosecutors sometime prior to the end of the retrial that he had learned "Randy" Newell was Samuel J. Newell.

Limiting the present discussion to Sergeant Gonzales' report, we note the record does not indicate whether this report was ever in the file. Harris testified he was never advised as to "Randy" Newell's true identity. If this report was in the file and was not disclosed, then a *Brady* violation occurred. But even if this report was not in the prosecutor's file, it is clear that for *Brady* purposes the knowledge of law enforcement personnel is imputed to the prosecutor, thereby constituting constructive knowledge of Newell's true identity. Accordingly, the State's argument, which was accepted by the magistrate judge, that Ms. Ferrara "did not *actually know* the true identity of Newell," is simply misplaced because actual knowledge is not necessary. Moreover, the State has not argued this information would not be evidence "favorable" to Mr. Smith, subject to *Brady* disclosure, thereby implicitly conceding that point, which is entirely proper in our view. Finally, we believe this evidence was "material" in that disclosure of "Randy" Newell's true identity, with the accompanying information regarding his prior convictions and fugitive status, can reasonably be said to have altered the verdict on this case.

### 2. "Randy" Newell's True Identity

The fact of "Randy" Newell's true identity, and the information as to his background, was not limited to Sergeant Gonzales' report. Detective Borunda testified he told one of the prosecutors some time before the end of the second trial that "Randy" Newell was Samuel J. Newell, and that he provided a rap sheet with Samuel J. Newell's record.

Although Detective Borunda testified he informed the prosecutors of this information, they denied ever learning of this fact or of ever obtaining a copy of a rap sheet for Samuel J. Newell, thereby creating a factual dispute in the record. If it was in fact true the prosecutors actually knew of Mr. Newell's real identity and nonetheless permitted

him to testify under a false name, then this case would be governed by *Napue*, which held the prosecution may not knowingly fail to correct information it knows to be false. *See Napue*, 360 U.S. at 269, 79 S.Ct. at 1177. Under such circumstances, the nondisclosed evidence would be presumptively material unless the State demonstrates the nondisclosure was harmless error. *See Agurs*, 427 U.S. at 104, 96 S.Ct. at 2398.

■■■ In this case, the state post-conviction court and the magistrate judge implicitly found Detective Borunda's testimony not credible because both courts concluded there was no evidence the prosecution had actual knowledge of Newell's true identity. We cannot say this finding of the district court is clearly erroneous because the evidence is susceptible to two permissible interpretations depending on the weight given to the testimony of the respective witnesses. *See Anderson*, 470 U.S. at 573–74, 105 S.Ct. at 1511–12; *see also Exxon Corp. v. Gann*, 21 F.3d 1002, 1005 (10th Cir.1994) (appellate court must uphold district court's factual findings as long as they are "permissible" in light of the evidence in the record). The only way these courts could have reached their conclusions would be to discredit Detective Borunda's testimony, and we do not second-guess such credibility determinations on appeal. *See, e.g., Church v. Sullivan*, 942 F.2d 1501, 1516 (10th Cir.1991) ("we treat a state court finding regarding witness credibility as a finding of fact."); *cf. Anderson*, 470 U.S. at 574–75, 105 S.Ct. at 1511–12 (emphasizing appellate courts owe heightened deference to trial court's credibility determinations under Rule 52(a)).

■■■ But while the factual determination that Detective Borunda did not convey this information to the prosecution avoids a *Napue* situation, it does not alter the fact that Detective Borunda, who himself was a member of the Albuquerque Police Department, knew of this false identity. Under prevailing

principles governing *Brady* claims, this information, having been possessed by an investigative arm of the state that the prosecution knew was involved in investigating this case, is imputed to the prosecution under *Brady*. Accordingly, the prosecution is deemed to have known "Randy" Newell was actually Samuel J. Newell; whether they had actual knowledge of this fact is irrelevant.[43]

In this respect, both the magistrate judge and the State manifested a misunderstanding of the applicable law. The magistrate judge repeatedly faulted Mr. Smith for failing to prove the prosecution's failure to disclose was done knowingly or intentionally. In so doing, however, we believe the magistrate judge placed an excessive burden on Mr. Smith because *Buchanan* and the discussion above hold exactly to the contrary, namely, that actual knowledge is not necessary to establish a *Brady* claim. The State, moreover, argues "[c]ommon sense infers the prosecution's obligation to disclose information is limited to that information which is in the possession of the prosecution." The problem is the State interprets the italicized language too narrowly, contending "possession" means "actual possession" and that "the prosecution" is limited to the prosecuting attorneys and not law enforcement personnel. For reasons already expressed, both of these interpretations of law are inaccurate.

It follows that because the State is deemed to have had knowledge of "Randy" Newell's true identity, it is accountable for failing to disclose his prior record of convictions and his fugitive status, which were the subject of a specific *Brady* request by Mr. Smith's counsel and which the State properly concedes are subject to *Brady* disclosure. Once again, for the same reasons discussed earlier, we find this evidence to be "material" because its nondisclosure undermines our confidence in the verdict. The prior convictions serve as significant impeachment evidence of Mr. Newell,[44] as does the fact he was at-

---

**43.** The finding that the prosecution did not have actual knowledge of Mr. Newell's true identity would demonstrate its failure to disclose was made in good faith. As we have repeatedly stated, however, state of mind is irrelevant under *Brady*.

**44.** At the time of Mr. Smith's trial, New Mexico's rules of evidence provided for impeachment by prior convictions by way of a statute modeled after Rule 609 of the Federal Rules of Evidence. *See* N.M.Stat.Ann. § 11–609(A)(1). It is clear impeachment of Mr. Newell with these prior

tempting to conceal his true identity. Furthermore, this evidence also supports Mr. Smith's defense that "someone else," someone with at least as strong of a motive as that attributed to Mr. Smith, may have committed these crimes.

■ The record thus discloses a classic situation where the left hand did not know what the right hand was doing. It appears that the various investigative agencies involved in this case constructed a wall separating the Bernalillo County investigation of Mr. Smith from the Torrance County investigation of Mr. Newell. But this lack of communication and coordination among arms of the state cannot be, and is not, a defense to the prosecution's failure to disclose favorable, material information to the defendant when that failure to disclose amounts to denying a criminal defendant a fair trial. *See Agurs,* 427 U.S. at 108, 96 S.Ct. at 2399–2400.

### 3. The Clothing Seized From "Randy" Newell's Car

We next address Mr. Smith's claim the prosecution failed to disclose the clothes seized from Mr. Newell's car. As indicated above, there is no distinction in the prosecutor's obligation to disclose *Brady* material when the defense makes a general request as compared to when the defense makes no request at all. If the evidence in question has an "obviously exculpatory character," then disclosure of that evidence is mandatory. *See Agurs,* 427 U.S. at 107, 96 S.Ct. at 2399.

In the present case, Mr. Smith argues the State was aware of the clothes prior to trial, that it suspected the substance on the women's underwear was blood but that it never tested the substance, and that it did not make the clothing available to the defense to allow it to test the substance. Thus, in the context of this case, given Newell's possible involvement in this case, Mr. Smith argues the prosecution violated *Brady* by failing to disclose the clothing. The State responds by arguing that any potential exculpatory value of the clothing is speculative since no testing was ever done, that the clothes were in the evidence room and were available upon request from Mr. Harris, and the magistrate judge found the clothing was not material.[45]

As an initial matter, there can be no doubt if the prosecution had tested the clothing, the results of those tests would have to be disclosed pursuant to the court's discovery order. That order provided, in relevant part, that the district attorney's office shall disclose to the defense, *inter alia,* "scientific experiments made in connection with this case, immediately, and shall continue to provide the copies to the defense counsel during the pendency of this action." The clothes, however, were never tested and no scientific reports ever produced before the clothes were destroyed. It is also undisputed both Ms. Ferrara and Mr. Anuskewicz knew these clothes existed prior to the start of the first trial in this matter; they had examined them at the evidence room in the Albuquerque Police Department.

■ The question thus becomes whether the prosecution had an obligation to disclose either the existence of these clothes, any testing of the clothes, or both,[46] to the de-

convictions would be well within the scope of the rule, albeit subject to the district court's discretion to exclude this evidence. *Id.* While we cannot be absolutely certain of how the trial court would have exercised its discretion, we believe that in light of the importance of Newell's testimony and the defendant's desire to undermine his credibility as much as possible, *see State v. Lucero,* 98 N.M. 311, 313–14, 648 P.2d 350, 352–53 (Ct.App.1982) (citing these factors as ones to be considered in determining whether to permit impeachment by prior conviction), it is probable these convictions would in fact have been admissible for the limited purpose of impeaching Newell. The failure to admit them for that purpose would arguably have been an abuse

of discretion under the circumstances of this case.

**45.** As noted below, the magistrate judge essentially adopted the state post-conviction court's determination on this issue. The magistrate judge, however, appears to have confused its obligation to give state court factual findings a presumption of correctness with its obligation to conduct a *de novo* review of the materiality of the evidence.

**46.** Mr. Smith contends he was entitled to cross-examine Mr. Newell about the clothes found in his car, even if they were not tested, as the mere fact that the clothes were in his car would have

fense, knowing that: they were seized from the vehicle of another suspect; everyone who examined the underwear said the substance might have been blood; the substance on the underwear was on the same side as the gunshot wound to Talton's leg; and Mr. Newell, a self-interested witness who was a suspect in these same crimes and who had been stopped in the vicinity where the bodies were found, indicated the substance was menstrual blood even though the substance was not in an area where menstrual blood would ordinarily be found. Under the unusual circumstances of this case, we believe the prosecution failed to comply with the requirements of *Brady* by not disclosing these clothes to the defense.

■ First, we once again reject the prosecution's reliance on its "open file" policy. The prosecution knew about the circumstances surrounding the seizure of these clothes, and Mr. Harris testified he was never made aware of their existence. He had no reason to know he should have asked to see these clothes since he did not know they existed.[47] While the clothes were marked in the evidence room with a tag, it stated "Articles from vehicle accident," and nothing more. Because Mr. Harris was never given the police reports indicating clothing had been seized from Mr. Newell's car and because he otherwise had no way of knowing he should be looking for these clothes, the prosecution's failure to advise him specifically of their existence was faulty.

■ Second, we have no trouble concluding this evidence was "favorable" to Mr. Smith. Even without medical tests of the clothing to evaluate whether the substance was in fact blood, the mere fact that Mr. Newell had these clothes in his car would itself have been a subject for cross-examination. As for the lack of any testing, the State's argument that the potential exculpatory value of testing is speculative because none was ever done is not persuasive. The

State possessed these clothes and at least Ms. Ferrara recognized the potential importance of the substance on the clothes, and she thus suggested tests be done. In spite of this initial decision, no tests were ever performed and the clothes were never made available to the defense to allow it to conduct independent tests. Under these circumstances, the State may not now claim that whatever exculpatory value the clothes possessed was speculative.

■ Finally, while the State asserts this evidence was not "material," in reliance on the magistrate judge's conclusion, we again respectfully disagree with that ruling. Our *de novo* review of the entire record in this case convinces us the result of the proceeding could reasonably have been different had the clothes taken from Mr. Newell's car been disclosed to the defense. This evidence was highly probative with respect to Mr. Smith's defense at trial and could very well have resulted in the first jury returning an acquittal. Under the circumstances of this case, our confidence in the outcome of the proceeding has been undermined. We cannot say that the result of the trial would have remained the same had this evidence been disclosed. Therefore, we find this evidence was "material" for *Brady* purposes.

### 4. "Randy" Newell's Statements

The last pieces of evidence at issue are Mr. Newell's statements to various law enforcement personnel. Although it does not appear a specific request for these statements was made, the State does not dispute its obligation to produce a witness' prior statements. The state post-conviction court found "[r]eports indicate statements were taken from Newell which statements were not in the files of the District Attorney, were not examined by the District Attorney, and which have never been located or verified as existing or as to content." The magistrate

---

been a legitimate area of cross-examination. While Mr. Newell would have stated the clothes were laundry, Mr. Smith contends the jury should have been permitted to hear this line of cross-examination in assessing Mr. Newell's credibility.

**47.** To the extent Mr. Harris' testimony is again self-serving, and he was aware of these clothes, his failure to utilize them at trial would again bear heavily on Mr. Smith's ineffective assistance of counsel claim.

judge did not expressly address the merits of this claim, stating only:

> Petitioner ... contends that much of the evidence marshalled by the Torrence [sic] County law enforcement, such as ... statements made by Newell, were material and exculpatory and should have been disclosed.... The Bernalillo County investigation superseded the preliminary one of Torrence [sic] County. The Torrence [sic] County tapes were not part of that investigation.

Thus, the magistrate judge seemed to erect a wall between the two local investigations, notwithstanding the fact they were both state entities and that the prosecuting office was aware that both entities were involved in investigating this case.

The State attempts to defend the nondisclosure of these statements by arguing its "open file" policy, and further, that "[t]he prosecution apparently did not have possession of or use the supposed statements during the trial or for purposes of investigation." We have previously noted why the State's reliance on the "open file" policy is misplaced. As an aside, the issue of Mr. Newell's statements presents a perfect example of the inadequacy of an "open file" policy with respect to the prosecution's obligations under *Brady:* the state postconviction court found that Mr. Newell's statements were not even in the file.

Furthermore, even assuming the prosecution did not know about these statements,[48] it is clear the various law enforcement personnel did. Accordingly, their knowledge is again imputed to the prosecuting attorneys for *Brady* purposes. The prosecution's alleged nonuse or lack of possession of these statements is an attempt by the State to alter the relevant inquiry. It remains undisputed the law enforcement personnel possessed these statements, and this is what is important, not whether the prosecution did or did not use or possess the statements.

Moreover, these statements are again evidence "favorable" to Mr. Smith as impeachment evidence relative to Mr. Newell's credibility. For the same reasons espoused above, we believe the failure to disclose these statements, when taken in conjunction with the other nondisclosures, undermines our confidence in the outcome of this case.

In sum, we hold the cumulative [49] effect of the prosecution's nondisclosures undermines our confidence in the outcome of the trial. We perceive the primary cause for these nondisclosures to be a lack of communication between various law enforcement agencies of the State of New Mexico, rather than a deliberate suppression of evidence. Nonetheless, the prejudice resulting from the prosecution's failure to coordinate the various investigations in this case cannot be allocated to the defendant when his constitutional right to a fair trial lies in the balance. "[T]he existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty." *Bagley*, 473 U.S. at 693, 105 S.Ct. at 3389 (Marshall, J., dissenting); *see also Robinson*, 39 F.3d at 1119. While some of this evidence, standing alone, may seem somewhat trivial, in the context of the entire record in this case, we believe the disclosure of all of this evidence might have led to a different result. In short, our confidence in the result of the retrial has been sufficiently undermined to warrant relief in this case.

Almost all of the nondisclosed evidence was relevant to Mr. Smith's attempt to demonstrate why "Randy" Newell had as much reason to have committed these murders as did Mr. Smith. The nondisclosure of this

---

48. Both Ms. Ferrara and Mr. Anuskewicz testified they knew Mr. Newell had given statements to certain individuals. Ms. Ferrara's knowledge is confirmed by her handwritten trial notes. Additionally, the state postconviction court's finding that the contents of these statements could never be verified is also questionable. Sergeant Gonzales indicated Mr. Newell told him the blood stains on the women's underwear found in his car were menstrual blood.

49. Because there are multiple *Brady* violations involved in this case, we express no opinion on the question of whether any one of these violations, standing alone, would warrant relief. Moreover, because we conclude Mr. Smith is entitled to relief on his *Brady* claims, we express no opinion on his remaining arguments.

evidence altered and affected Mr. Smith's preparation and presentation of his defense at trial. The fact that the prosecution's case was entirely circumstantial, coupled with the fact that the jury in Mr. Smith's first trial was unable to reach a unanimous decision, creates a reasonable probability the result of the proceeding would have been different had this evidence been disclosed to the jury. Prosecutor Virginia Ferrara even expressed her skepticism at whether a conviction would have been possible if this evidence had been disclosed. *E.g., Bowen,* 799 F.2d at 610 (recognizing the relevance of the prosecutor's own views as to the effect the evidence would have had on the ability to convict). Therefore, we find Mr. Smith has sustained his burden of establishing he was denied a fair trial under *Brady*.[50]

## CONCLUSION

The due process clause does not confer upon a criminal defendant a right to an error-free trial. *See United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). But it unquestionably guarantees a criminal defendant a fundamental right to a *fair* trial. *See Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). For the reasons stated above, we are compelled to hold the prosecution's failure to disclose several pieces of relevant, material exculpatory evidence to Mr. Smith violated his constitutional due process right to a fair trial. In so doing, we merely applied settled principles of law to the facts of this case; we did not increase the prosecution's burden to disclose information nor did we increase the defendant's right to receive information. All we hold is that under the facts of this case, the prosecution did not fulfill its obligation to disclose to Mr. Smith material exculpatory evidence. It bears repeating that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defen-

dant's life or liberty may depend." *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177.

Our holding should not be interpreted as undermining the important interests of comity and federalism inherent in our dual sovereignty system of governance. These interests undoubtedly command hesitation before acting under these circumstances; yet, these interests do not exist in a vacuum. They must be understood in light of the countervailing obligation of the federal courts to insure that a criminal conviction is not obtained in violation of the Constitution.

In sum, we **GRANT** Mr. Smith's request for a certificate of probable cause to appeal. Based on our conclusion his conviction is constitutionally infirm, we **VACATE** the conviction, and **REMAND** this case to the district court. In attempting to comply with our statutory mandate of disposing of habeas corpus proceedings "as law and justice require," 28 U.S.C. § 2243, *see also Burton v. Johnson,* 975 F.2d 690, 693–94 (10th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993), we instruct the district court on remand to enter an order directing the State of New Mexico, within ninety (90) days of the entry of that order, to either grant Mr. Smith a new trial or, in the alternative, to order his permanent release from custody.

---

**50.** Because we conclude Mr. Smith is entitled to federal habeas corpus relief based on his *Brady* claims, we need not address his remaining claims in support of his petition for relief.