**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 19 1997**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

RICHARD MCCARTY,

      Petitioner-Appellant,

v.

DONALD A. DORSEY, Warden,
Southern NM Correctional Facility,

      Respondent-Appellee.

No. 96-2132
(D.C. No. CIV-94-1428-HB)
(D. N.M.)

---

ORDER AND JUDGMENT[*]

---

Before PORFILIO and LOGAN, Circuit Judges, and BURRAGE, District Judge.[**]

---

After examining the briefs and appellate record, the panel has determined unanimously that oral argument would not materially assist the disposition of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. Petitioner's motion for oral argument is therefore denied, and the case is ordered submitted on the briefs.

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]    Honorable Michael Burrage, Chief Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

Petitioner appeals from the denial of habeas relief under 28 U.S.C. § 2254. This case arises out of his New Mexico conviction on charges of criminal sexual penetration, kidnapping, and bribery of a witness. After conviction, petitioner moved for a new trial on the basis of newly discovered evidence concerning allegedly flirtatious behavior by the victim toward a police officer who took her home from the hospital several hours after the incident. The trial court denied the motion, and the New Mexico Court of Appeals affirmed under state law holding that mere impeachment evidence is insufficient to warrant a new trial. In the ensuing habeas proceedings, the district court adopted the magistrate judge's recommendation to deny the same claim, now explicitly couched in terms of a violation of Brady v. Maryland, 373 U.S. 83 (1963),[1] holding that the victim's statements would have been inadmissible under New Mexico's rape shield law and, in any event, were not material under Brady standards.

In habeas proceedings, we review the district court's legal conclusions de novo and its factual findings for clear error. Hill v. Reynolds, 942 F.2d 1494, 1495 (10th Cir. 1991). As explained below, we do not rely on the uncertain scope of New Mexico's rape shield law, resting our disposition instead on Brady's

---

[1]     There is some question whether the Brady claim was exhausted through the state proceedings on petitioner's motion for new trial, which evidently was based on newly discovered--not improperly withheld--evidence. However, as the parties have not disputed the matter, and the case is straightforward on the merits, we forego any definitive resolution of the exhaustion question.

materiality requirement. On de novo review of this mixed question of law and fact, see Smith v. Secretary of N.M. Dep't of Corrections, 50 F.3d 801, 827, 833 (10th Cir. 1995), we conclude that the district court properly rejected petitioner's challenge to his conviction.[2]

"[T]o establish a Brady violation, the [petitioner] bears the burden of establishing: 1) that the prosecution suppressed evidence; 2) that the evidence was favorable to the accused; and 3) that the evidence was material." Id. at 824 (footnote and quotation omitted). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different," i.e., "when the Government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles v. Whitley, 115 S. Ct. 1555, 1565, 1565 (1995) (quotations omitted) (also "disavow[ing] any difference between exculpatory evidence and impeachment evidence for Brady purposes"). We view the undisclosed evidence in relation to the record as a whole, as the materiality of exculpatory evidence will vary with the overall strength of the government's case. Smith, 50 F.3d at 827.

---

[2]     Since we would reach the same result under the (stricter) provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 119 Stat. 1214, we need not resolve the retroactivity issues that its application would raise here. See Houchin v. Zavaras, 107 F.3d 1465, 1470 (10th Cir. 1997).

The issue at petitioner's trial was consent; sexual intercourse had been admitted. Thus, he contends any subsequent conduct by the victim behaviorally inconsistent with her allegation of assault was material to the defense. Cf. Commonwealth v. Killen, 680 A.2d 851, 852-54 (Pa. 1996) (reversing conviction because court erroneously excluded sexually provocative statements by victim which "could be fairly construed by the jury as being inconsistent with that of a person recently criminally assaulted"). Just such evidence, he maintains, was known to Albuquerque police officer Guadalupe Guevara, and through him the state prosecutors, see Kyles, 115 S. Ct. at 1567-68; Smith, 50 F.3d at 831, but was not provided to the defense until after trial.

On petitioner's motion for new trial, the state court held a hearing to allow officer Guevara to relate his account of the victim's conduct at the hospital where she was given a sexual assault exam. He testified in pertinent part as follows:

Q. (By [defense counsel]) What else did [the victim] say to you?

A. Well, she requested a ride home. That was one thing I did promise her and also her friend, I would give them a ride home after they were done with the testing. And while they was there, I don't know if I would call it flirting, but she asked me if I would give them -- her a ride home after I dropped off her friend.

Q. Did you ever tell me that she was flirting with you?

A. I thought it was kind of flirting. She was smiling and so forth. I thought that was kind of peculiar because she claimed she had just been raped.

-4-

Q. Did, in fact, she come on to you a little bit stronger than that?

A. It's hard to say. I mean, I don't know.

Q. Did you ever tell myself or [co-counsel] you felt she was coming on to you?

A. I don't know if it was coming on to me, but her attitude didn't fit what had just occurred and I thought it was just, you know, just kind of strange. I guess you could say it was kind of flirting in a sense, but it wasn't direct questions or anything.

. . . .

Q. (By [defense counsel]) Officer, did [the victim] make a pass at you that night?

A. I don't know if she was making a pass at me. That's such a general question, to make a pass at me.

. . . .

A. I mean -- in the hospital, in the situation that was going on and everything, okay, with the things she was saying and so forth, I thought it was strange, okay? I'm in my uniform. I'm not thinking to that effect, okay, and I just thought it was odd. I mean, she commented on something to the effect that she thought I was good looking and then she asked me if I would give -- that was one of the things I promised. I would give her a ride home. Whether she was making a pass or not, I don't know, I mean -- or coming on to me, I don't know.

Q. Was there anything in her conduct that led you to believe that she wanted something more than a ride home from you? Did she sit particularly close to you, anything of that nature?

A. No, she never did. . . .

. . . .

Q. So, when she asked you to give her a ride home, she didn't have any

other means of transportation; is that right?

A.    No, she didn't.

Q.    And other than that, her smiling at you, telling you you're good looking, and asking you for a ride home, was there anything else she did?

A.    No.

R. Vol. VIII at 8-9, 12, 14, 20.  When asked why he had not mentioned any of this before or during petitioner's trial, officer Guevara explained:

> My opinion is, regardless of how she acts, that doesn't mean whether she was raped or not, okay?  For all I know, she could have blocked it out, whatever, when she is there.  She generally seemed to be upset at the scene and at first while at the hospital.  Whether I think -- whether she thought I was good looking or whether she wanted a ride home, I still don't know what that meant.  That doesn't mean that she wasn't raped.

Id. at 15.

Several considerations combine to undercut the force of this testimony. First of all, what significance it has is a function not of the objective conduct of the victim, which is facially innocuous, but only of the subjective interpretation officer Guevara placed on that conduct.  And, his own confidence in that interpretation was decidedly weak.  Moreover, as officer Guevara himself noted and the trial record clearly substantiates, the victim's behavior was otherwise entirely consistent with her allegations throughout the extended ordeal:  from the initial encounter with the first officer on the scene, see R. Vol. III at 128-32 (victim exited petitioner's car and hurriedly approached officer; she was "very

-6-

excited" and "irate;" she "looked like she had been crying;" and "[s]he just told [the officer] that she needed to talk to [him] and right away she mentioned to [him] that [petitioner] had raped her"), and the immediate questioning by officer Guevara, see R. Vol. IV at 22-23, 29-31 (victim was "irate" and "angry;" she was crying "off and on" during 15-minute interview; "[she] would shift from anger to . . . crying and then she would yell at [petitioner]"), to the interview with the sex crimes detective, see id. at 47-49 (victim was "visibly upset," "emotional," and "crying"), and on through the hospital examination, see R. Vol. VIII at 15 (victim "generally seemed to be upset . . . at first while at the hospital"). Considering the one ambiguous incident with officer Guevara against the backdrop of this lengthy course of conduct, which extends back much closer in time to the events the victim's behavior is being used, inferentially, to confirm or deny, cf. Killen, 680 A.2d at 853-54 (noting significance of "sexually provocative" conduct by victim "*immediately* after alleged assault" (emphasis added)), we are not persuaded that the undisclosed evidence was material.

The presence of independent evidence corroborating the victim's accusations further supports our conclusion. The trial record shows, for example, that (1) the victim's skirt was torn, her pantyhose was ripped open at the crotch, and her body was newly bruised; (2) petitioner was overheard telling the victim to "shut up" as the police first approached, then gave conflicting versions of such

-7-

basic facts as whether he had penetrated the victim and whether the act occurred outside or inside the car, and later offered the internally inconsistent story that, while he had carried the unconsciously drunk victim (a description belied by every other witness's observation of her condition) to his car from a bar, shortly thereafter she physically forced herself on him and him in her; and (3) petitioner had a knife matching the victim's description of the one used to threaten her, though petitioner claimed he had never taken it out for her to see.

In sum, the undisclosed evidence regarding the victim's "atypical" post-assault behavior is weak on its face, and is essentially overwhelmed by contrary evidence adduced on the point at trial. Further, petitioner was not convicted solely on the basis of the victim's uncorroborated accusations; other, independent evidence pointed to his guilt. Under the law noted above, we hold that while petitioner raises a substantial constitutional issue under Brady, he ultimately cannot meet the materiality requirement necessary to warrant relief.

Accordingly, we grant a certificate of appealability under 28 U.S.C. § 2253(c) and AFFIRM the judgment of the district court denying the petition.

Entered for the Court

Michael Burrage
Chief District Judge